621 A.2d 999

**Rachel GREER, Individually and as Administratrix of the Estate of Monique Greer, Deceased**

v.

**Harvey BRYANT, D.O. and Philadelphia College of Osteopathic Medicine.**

**Appeal of: PHILADELPHIA COLLEGE OF OSTEOPATHIC MEDICINE**

Superior Court of Pennsylvania.

Argued Dec. 15, 1992.

Filed Jan. 27, 1993.

Reargument Denied March 31, 1993.

R. Bruce Morrison, Philadelphia, for appellant.

Richard P. Abraham, Philadelphia, for appellee.

Before OLSZEWSKI, TAMILIA and HESTER, JJ.

OLSZEWSKI, Judge:

This is an appeal from an order denying the defendant hospital's motion for a judgment notwithstanding the verdict and other post-trial relief. After a lengthy medical malpractice trial, a jury found the hospital ("PCOM") 41% negligent in causing the death of Rachel Greer's newborn child. We find that the trial court did not err in denying the relief and affirm.

While she was pregnant, Rachel Greer ("Rachel") was under the care of Dr. Bryant. The doctor diagnosed Rachel as having a condition known as pre-eclampsia. Pre-eclampsia is characterized as a condition caused by high blood pressure in the mother which poses risk to an unborn child during the final trimester of pregnancy. Such risks manifest themselves

in "fetal distress," which is often identified by low or irregular fetal heartbeats. Once fetal distress is apparent, the doctors are alerted that immediate care for the child is necessary, and delivery is often necessary.

During the final months of her pregnancy, Rachel was admitted as an outpatient to PCOM on several occasions. Protocol in these situations dictates that the medical residents and interns of the hospital, physicians themselves, perform certain tests and communicate the results to the patient's doctor. The doctor then advises the residents/interns how to proceed. In this case, the evidence established that Rachel began displaying symptoms of "fetal distress" on September 20, 1991. During her visit to PCOM on that date, the residents/interns administered tests which showed that the fetus suffered from "decelerations," a periodic lowering of the heart rate. Although it is disputed whether the residents communicated this to Dr. Bryant, it is undisputed that Rachel was sent home and told to return on September 23.

During the September 23 visit, the residents diagnosed Rachel's fetus as having "poor beat to beat variability." Nonetheless, Rachel was again sent home, being advised to visit on September 27. On September 26, Rachel suffered from severe pains. She called PCOM's emergency room employees, who told her that she should wait to be admitted until her appointment the next day. On that day, however, Rachel received a phone call from a PCOM employee cancelling her appointment due to inclement weather. Finally, at the insistence of her sister, Rachel was admitted to the University of Pennsylvania Hospital for delivery on September 27. The child was delivered with a condition known as "severe meconium aspiration." In essence, the child inhaled its own fecal matter *in utero*. The matter filled the child's lungs to the point where she could only muster a quiet whimper at birth. She unfortunately died of the condition several days later.

Rachel sued Dr. Bryant and PCOM individually and on her deceased daughter's behalf. Dr. Bryant offered a settlement which Rachel accepted. The case went to trial against PCOM

and a jury found PCOM 41% liable to Rachel. The crux of Rachel's negligence claim is that she should not have been sent home on September 23. The child should have been delivered by Dr. Bryant on that date, given the symptoms revealed in the tests on the fetus. Rachel's case against PCOM was based on her factual allegations that the residents did not communicate to Dr. Bryant the results of the pre-natal tests conducted on September 20 and 23. Alternatively, Rachel attempted to establish that even if the results of the tests were communicated to Dr. Bryant and Dr. Bryant insisted on sending Rachel home, the residents should have known that the baby was in danger. They furthermore should have sought Rachel's admission to the hospital and the child's delivery by reporting the incident to their superiors.

PCOM now claims that the trial court erred in denying a judgment n.o.v. in its favor because: (1) there was no evidence to establish that the residents did not communicate the test results to Dr. Bryant, and (2) the trial court allowed Rachel's expert to testify beyond the fair scope of her report in rendering an opinion that the residents should have gone over Dr. Bryant's head to seek delivery of the child. PCOM also argues that the trial judge erroneously admitted evidence of a "productivity factor" to determine the deceased infant's earning capacity. Finally, PCOM claims that it was prejudiced by the trial judge's inaccurate summary of the evidence during his instructions to the jury. We disagree with all of these arguments and affirm.

I. *Was the evidence of PCOM's negligence sufficient to withstand a motion for judgment n.o.v.?*

PCOM argues that the trial judge should have granted its motion for a judgment notwithstanding the verdict. It argues that there was no competent evidence on which the jury could base its finding that PCOM's employees failed to communicate test results to Dr. Bryant. We disagree.

A judgment notwithstanding the verdict should be granted only in a clear case where no two reasonable minds could fail to agree that the verdict was improper. *Robertson*

*v. Atlantic Richfield,* 371 Pa.Super. 49, 537 A.2d 814, *alloc. denied,* 520 Pa. 590, 551 A.2d 216 (1987). On review, we must consider only the evidence which supports the verdict and give the verdict winner the benefit of any doubt and any inference deducible from the evidence. *Id.* We will reverse only if the trial court abused its discretion. *Timbrook v. Foremost Insurance Co.,* 324 Pa.Super. 384, 471 A.2d 891 (1984).

█ PCOM argues that the evidence conclusively establishes that its employees communicated all relevant information to Dr. Bryant. This argument rests on PCOM's assertion that its residents "emphatically" testified that they called Dr. Bryant on many occasions. Also, PCOM cites Dr. Bryant's testimony, which asserted that had the residents failed to contact him, he would have made an effort to contact the hospital. Since Dr. Bryant made no such effort, PCOM concludes, the residents must have provided the doctor with all critical information. Moreover, PCOM cites Dr. Bryant's testimony that delivery of the child was a last resort and that "repositioning" the mother while she lay in bed might control the fetus' heart rate. Dr. Bryant acknowledged that this "repositioning" did cure the fetus' irregular heart rate on one occasion. Thus, PCOM argues that this establishes that the hospital and the doctor were in constant communication.

PCOM's argument simply overlooks the fact that no one, either the residents or Dr. Bryant, could testify regarding the content of the phone conversations between PCOM's employees and Dr. Bryant. Indeed, Dr. Bryant testified that he could not recall receiving any phone calls. R.R. 191A. Although a PCOM intern testified that she called Dr. Bryant, she could not recall the substance of the conversation. R.R. 732A. Moreover, a PCOM intern's records acknowledged that she called Dr. Bryant on September 23, but she could not recall the conversation. R.R. 596A–597A. Clearly, it was then for the jury to consider the credibility of the witnesses and determine whether the critical information was communicated during the calls. Dr. Bryant testified that he would have ordered delivery of the child had he been informed of the fetus' decelerated heart rate. R.R. 154A. This evidence

clearly allows the inference that the phone conversations between PCOM and Dr. Bryant did not disclose the severity of the fetus' condition to him. The trial judge was required to accept that the jury made that inference when ruling on the judgment n.o.v. and we will not disturb his ruling.

Also, the evidence established only that Rachel was "repositioned" in an effort to control the fetus' heart rate on September 20. R.R. 733–734A. Since many of the critical events occurred on September 23, the jury could have determined that PCOM's employees' crucial non-feasance occurred on that date. Again, we must assume that the jury drew this inference. We find no abuse of discretion. There were ample grounds on which the jury could have found PCOM negligent.

II. *Did the expert testify outside the fair scope of her report?*

■ PCOM argues next that plaintiff offered a "new theory" at trial. This theory attempted to establish that even if Dr. Bryant told PCOM's employees that Rachel's condition did not warrant delivery of the child, PCOM's employees should have sought admission of Rachel on their own and arranged for the child's delivery. PCOM argues that the only evidence supporting this theory was through the opinion testimony of Rachel's expert. Since the expert's report contained no such opinion, PCOM claims that it was unfairly surprised by this opinion at trial. Therefore, PCOM argues, the opinion should have been disallowed and the jury should not have been allowed to consider this new theory.

First, we note that in seeking a judgment n.o.v. on these grounds, PCOM is seeking the incorrect relief. "Judgment n.o.v. . . . does not lie for correction of errors in admission or exclusion of evidence. Such errors are properly the subject of a motion for a new trial." *Hoffmaster v. Allegheny County,* 121 Pa.Commw. 266, 273, 550 A.2d 1023 (1988) (citing *Stewart v. Chernicky,* 439 Pa. 43, 266 A.2d 259 (1970)). Our Supreme Court has held that only the evidence received, whether properly or erroneously admitted, may be considered when ruling on a motion for judgment n.o.v. *Rosche v. McCoy,* 397 Pa. 615, 156 A.2d 307 (1960). Here, Rachel's expert testified that it was below the standard of care for the residents of

PCOM to send Rachel home on September 23, given the facts known to the residents at that time. R.R. 467A. Since the evidence established that the residents made no such effort, the jury could logically infer that the residents were negligent. The *motion for judgment n.o.v.* was properly denied.

■ PCOM does argue, albeit in the alternative, that it is entitled to a new trial. We therefore must consider whether the expert testimony was properly admitted. We find that it was.

The trial judge has wide discretion to allow the admission of expert testimony into evidence, and we will not reverse unless there has been a clear abuse of discretion. *Bowser v. Lee Hospital,* 399 Pa.Super. 332, 582 A.2d 369 (1990), *alloc. denied,* 527 Pa. 614, 590 A.2d 755 (1990). Rule 4003.5(c) of the Pennsylvania Rules of Civil Procedure provides that an expert witness may not testify on direct examination concerning matters which are either inconsistent with or go beyond the fair scope of matters testified to in discovery proceedings or included in a separate report. *Id.* We have stated that it is often a difficult task to discern whether an expert's testimony exceeds the "fair" scope of her report. *Wilkes–Barre Iron v. Pargas of Wilkes–Barre,* 348 Pa.Super. 285, 502 A.2d 210 (1985). In *Wilkes–Barre Iron,* we concluded that while each case is unique, we must examine whether admission of an expert's testimony will disserve the purpose of Rule 4003.5. The rule promotes disclosure of all relevant information to parties and prevents a party from being unfairly surprised by enabling him to prepare a meaningful response to the expert testimony. *Id.* at 289, 502 A.2d at 212. We cannot hold that PCOM was unfairly surprised by plaintiff's expert's testimony.

Rachel proffered Dr. Mary Gabrielson as her expert medical witness. Dr. Gabrielson filed three reports during discovery, all of which are acknowledged by PCOM. Dr. Gabrielson testified at trial that in her opinion, if hospital personnel did not communicate the information regarding the test results to Dr. Bryant, the hospital's conduct would be below the standard of care. This opinion was a nearly verbatim recitation of her written report of January 22, 1991. R.R. pp. 22–23. Dr.

Gabrielson also proffered at trial that an intern should have sought Rachel's admission by consulting a hospital superior even if Dr. Bryant told the intern to send Rachel home. R.R. 468A. PCOM argues strenuously that this new "failure to override [Dr. Bryant's possible orders to send Rachel home] theory" was not contained in the reports and that they were unfairly surprised by the opinion. We disagree.

In her report of January 12, 1988, Dr. Gabrielson responded to questions posed by Rachel's counsel. The report included the following questions:

3. Ms. Greer was sent to Osteopathic Hospital on 3 occasions for non-stress and contraction stress testing. On the second occasion, September 20, 1985, it was noted that the baby's heart rate showed poor variability ... Could you explain the significance of this finding with regard to the health and well-being of the fetus.

A. The episode of bradycardia observed on September 20 was a very ominous sign and very suggestive of cord compression probably resulting from olighydramnios. This would result in fetal distress with meconium passage and aspiration. It could also result in sudden intrauterine fetal death.

4. Once the fetal distress was detected, did the hospital act appropriately by sending Ms. Greer home?

A. No.

5. What measures, if any, should have been taken to ensure the health and well-being of the fetus?

A. Ms. Greer should have been admitted and delivered. R.R. 12A–21A.

Dr. Gabrielson's report clearly states that, in her opinion, the hospital employees should not have sent Rachel home after observing her condition on September 20. Her report does not contain any qualification of this opinion, but is couched in rather absolute language. Questions regarding whether the interns should have sent Rachel home even if Dr. Bryant asked the interns to do so are a fair corollary to her opinion. Indeed, it seems that upon reading the report, the natural response to Gabrielson's assertion would be "was the

hospital acting inappropriately *even if* Dr. Bryant wanted Rachel to be sent home?" Put another way, the essential question in this case is whether PCOM was negligent in sending Rachel home. The expert's report opines that PCOM's conduct in doing so was below the standard of care. It is only natural to seek a qualification of that statement. Therefore, the qualification of the statement is within the report's "fair" scope. PCOM's decision to send Rachel home was contemplated by the report and counsel should have anticipated that the "failure to override theory" was looming.

Since Dr. Gabrielson's testimony was within the fair scope of her report, her testimony was permissible. The trial judge did not abuse his discretion.

III. *Was the "productivity" factor implemented properly?*

█ PCOM argues that the judge improperly allowed expert testimony which used a 1.1% "productivity factor" to calculate the deceased child's potential earning capacity. PCOM claims that since the child was not old enough at her death to exhibit tangible objective factors that would demonstrate the child's earning potential, the expert had no foundation on which to base his 1.1% figure. We disagree.

By now, it is well-settled that in order to determine lost wages vis-a-vis a plaintiff's potential earning capacity, the use of a productivity factor is proper to estimate a plaintiff's potential productivity increase. *Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027 (1980). A "productivity factor" takes into account an individual's ability to influence his rate of income earning power over time by considering objective criteria such as age, maturity, education, and skill. *Id.* at 573, 421 A.2d at 1033. The basis for sanctioning the use of a productivity factor is the progressive notion that while damages are never capable of precise mathematical computation, the inherently speculative nature of damages should not justify the exclusion of reliable economic theory from the jury's consideration. *Id.* at 574–575, 421 A.2d at 1034. PCOM argues that the Supreme Court's holding in *Kaczkowski* requires a "proper foundation" for the introduction of a productivity factor. Thus, since Rachel was unable to identify any of

the objective criteria normally involved in a productivity analysis (*i.e.,* age, maturity, prior work experience, etc.) for her newborn child, no "proper" foundation had been laid for the factor. This argument is specious. We do not read *Kaczkowski*'s proper foundation requirement as one that must be rigidly applied. Rather, *Kaczkowski* is premised on the notion that although every victim is entitled to full compensation, calculation of damages is inherently speculative. Reliance on economic data is helpful in aiding the factfinder and reducing the amount of guesswork that naturally exists when determining damages. Thus, the "proper foundation" for the admission of a productivity factor can only be determined on a case by case basis, taking into account plaintiff/victim's personal circumstances.

In this case, the economic expert calculated the newborn child's 1.1% productivity factor based on the objective criteria demonstrated by the child's mother. As the trial court noted, in a case where an infant is entitled to uncertain future loss damages, a reasonable basis with which to calculate the factor is with the mother's objective criteria. The only alternative, precluding an infant from proving such damages in the context of a survival action brought by her parents, would ignore the economic reality that that child possessed potential earning capacity. Projecting that child's productivity potential on a plane equal to that of her parent is certainly more "proper" than ignoring that potential altogether.

The trial judge did not abuse his discretion in allowing the economic expert to apply a productivity factor based on the deceased child's mother's experiences.

IV. *Did the trial judge's summary of the evidence prejudice the defendants?*

PCOM argues last that the trial judge's summary of the evidence was inaccurate and that it was prejudiced by his "slanted" mischaracterizations. We disagree.

A trial judge may summarize the evidence presented to a jury. *Noecker v. Johns–Mansville,* 355 Pa.Super. 463, 513 A.2d 1014 (1986). The trial judge must also caution the jury

that they should not consider anything he says, for his characterization of the testimony is not evidence. This cautionary instruction may cure any potential prejudice caused by inconsistencies in the court's summary. *Id.*

■ Our review of the trial judge's instructions to the jury indicate that any prejudice that may have been caused by the alleged inconsistencies were cured by the court's cautionary instructions. Indeed, the court exhaustively instructed the jury on no less than six occasions that they may not accept his recollection of the evidence as fact. The trial judge demonstrated ample caution.

The judgment is affirmed.