## Jackson v. Medical College of Pennsylvania Hospital

520

*Frank M. McClellan,* for plaintiff.
*Donald Ladd,* for defendants.

GORDON, *J.,* April 22, 1998—This is a medical malpractice action that arose as a result of the alleged delayed diagnosis and surgery of the plaintiff's decedent.

This case was brought by the plaintiff, Robert S. Jackson, on behalf of the estate of his late wife, Aven S. Jackson. The plaintiff as administrator sought damages from the defendants, The Medical College of Pennsylvania, Michelle Battistini M.D., Deurward Hughes M.D., and Thomas Santora M.D. Both a wrongful death and survival action were instituted against the defendants.

This litigation was predicated on the following facts: On December 15, 1992, the decedent, Aven Jackson, who was 46 years of age at the time, entered MCP for an elective hysterectomy to be performed by Dr. Battistini. Following the surgery, no complications developed the first two days. On the third day postoperative, Mrs. Jackson began to experience abdominal pain and fever. This condition continued until the sixth postoperative day. Dr. Battistini and the physicians attending to Mrs. Jackson diagnosed her condition as a bowel obstruction.

On the sixth day after surgery, Dr. Battistini performed abdominal surgery on the decedent to determine the nature of the problem. She was assisted during this operation by Dr. Hughes, who was the chief of the department of obstetrics and gynecology at MCP. The surgery showed that the problem was not a bowel ob-

struction, but instead a portion of the bowel had herniated through a membrane that covers the abdominal organs. Dr. Battistini reinserted the bowel into the abdomen and called Dr. Santora, a general surgeon, for consultation.

After performing a Doppler test on the bowel, Dr. Santora concluded that the bowel was viable. Based on the assessment that it was viable, the doctors did not perform a resection of it during this surgery.

When there was no improvement in Mrs. Jackson's condition after 24 hours, another abdominal surgical procedure was necessitated. At this time, Dr. Santora determined that approximately six feet of small bowel was not viable and performed a resectioning of affected portion. Mrs. Jackson subsequently underwent four more operations. After six operations, her condition did not improve and she succumbed on January 12, 1993 of system failure, approximately 28 days after the original surgery.

The plaintiff contends that his wife's death was due to the negligence of the named defendant doctors, other physicians, and nurses who attended Mrs. Jackson while she was a patient at MCP. He bases this theory on the assertion that there was an unreasonable delay in diagnosing the mechanical bowel obstruction, and when it was discovered, the physicians failed to resect it in a timely manner. The plaintiff presented the testimony of two board-certified general surgeons, Dr. Theodore Bitsack and Dr. Theodore Struhl, to support his propositions.

On March 25, 1997, after a trial before this court and a jury, the jury found the defendants MCP and Battistini negligent and returned a verdict in favor of the plaintiff against them. Hughes and Santora were found not liable. The jury found Battistini 60 percent

liable and MCP 40 percent liable. Damages were awarded in the amount of $750,000. The two defendants found culpable filed a timely post-trial motion requesting a new trial or in the alternative judgment notwithstanding the verdict.

In requesting j.n.o.v. or new trial, the defendants have averred that:

(1) Over the defendants' objection, this court erred when it allowed the plaintiff's experts to give unqualified testimony and render an opinion as to the standard of care for a board-certified gynecologist;

(2) This court erred by allowing the testimony of the plaintiff's experts to go beyond the scope of their reports;

(3) This court committed error by not providing instructions to the jury on the different schools of thought doctrine;

(4) This court erred by not instructing the jury to reduce future damages to present worth; and

(5) The plaintiff's experts did not provide opinions with the required level of medical certainty.

The defendants' post-trial motion was denied.

In reviewing the request for a new trial, the court must determine if the verdict is so contrary to the weight of the evidence that it "shocks one's sense of justice" or results in a miscarriage of justice. See *e.g., Thompson v. City of Philadelphia,* 507 Pa. 592, 493 A.2d 669 (1985). Such a determination is always within the discretion of the trial judge and is reviewable only where there is an abuse of discretion. See *e.g., Sacco v. City of Scranton,* 115 Pa. Commw. 512, 540 A.2d 1370 (1988); *Myers v. Gold,* 277 Pa. Super. 66, 419 A.2d 663 (1980); *Macina v. McAdams,* 280 Pa. Super. 115, 421 A.2d 432 (1980).

Judgment n.o.v. will only be granted when the moving party is entitled to judgment as a matter of law or because the evidence is such that no two reasonable minds could disagree. *Moure v. Raeuchle,* 529 Pa. 394, 604 A.2d 1003 (1992). The facts must be considered in a light most favorable to the verdict winner, in this case the plaintiff. *Moure, supra.* Because this court is, in a sense, intruding upon the province of the jury, we will review the entire record to determine if there exists a serious injustice. *Hilbert v. Katz,* 309 Pa. Super. 466, 455 A.2d 704 (1983).

## I. EXPERTS QUALIFIED TO OPINE ON THE STANDARD OF CARE

In medical malpractice cases, expert testimony is required to determine the standard of care in assessing whether there was negligence by the defendant doctor or hospital. The defendants aver that such testimony must be presented by an expert in the particular field or specialty of the defendant doctor in order to fully assess whether the proper standard was met. Dr. Battistini is a board-certified gynecologist and obstetrician, whereas plaintiff's expert, Dr. Bitsack, is a general surgeon who has not performed gynecological surgery since the early 1970s.

The defendants aver that although Dr. Bitsack was only offered as an expert in general surgery, this court allowed his expert opinions regarding the standard of care of an obstetrician. Additionally, the second expert, Dr. Struhl, is also not board certified in gynecology. Therefore, the defendants state, he should not have been permitted to testify as to the standard of care of Dr. Battistini.

The defendants refer this court to a series of case law which provides that experts should not be permitted to

testify as to the standard of care for a medical procedure which falls outside their areas of specialization. See *Dambacher by Dambacher v. Mallis,* 336 Pa. Super. 22, 485 A.2d 408 (1984); *Harris v. Campbell,* 409 P.2d 67 (Ariz. App. 1965); *Sweeney v. Blue Anchor Beverage Co.,* 325 Pa. 216, 189 A. 331 (1937).

The defendants, however, construe the treatment of Mrs. Jackson too narrowly. The question was whether the experts had a reasonable pretension to specialized knowledge with respect to the issue before the court or jury. *McDaniel v. Merck, Sharp & Dohme,* 367 Pa. Super. 600, 533 A.2d 436 (1987). This court held in the affirmative. A portion of Mrs. Jackson's treatment, for which the plaintiff's experts provided an opinion, was the care of a patient believed to have an obstructed bowel and a herniated bowel. The expert testimony does not address the gynecological procedure for which Mrs. Jackson initially consulted Dr. Battistini.

The cases cited by the defendants for support each involves an expert testifying beyond his or her area of specialized knowledge. This is what the defendants allege was the case with the plaintiff's experts. This court disagrees. Dr. Bitsack and Dr. Struhl were not called to give opinion testimony regarding the standard of care for obstetrics or gynecology. They were, however, fully qualified, and did so testify, as to the standard of care provided after the medical team suspected that Mrs. Jackson had a possible bowel obstruction and herniated bowel.

Both Dr. Bitsack and Dr. Struhl were qualified in training and expertise to the level necessary to clarify for the jury those concepts not generally within the reach of the layperson, and to further render an opinion as to the general standard of care for the treatment of bowel obstruction and herniation.

In *Chanthavong v. Tran,* 452 Pa. Super. 378, 682 A.2d 334 (1996), the Superior Court reviewed the law regarding qualifications of expert witnesses. The test to be applied is whether the witness "has any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine." 452 Pa. Super. at 385, 682 A.2d at 338 (citing *Commonwealth v. Gonzalez,* 519 Pa. 116, 128, 546 A.2d 26, 31 (1988)); see also, *Kuisis v. Baldwin-Lima-Hamilton Corp.,* 457 Pa. 321, 338, 319 A.2d 914, 924 (1974); *Moodie v. Westinghouse Electric Corp.,* 367 Pa. 493, 501, 80 A.2d 734, 738 (1951). In *Chanthavong,* the plaintiff suffered severe back injuries as a result of a motor vehicle accident. In order to show there were serious noneconomic damages, the plaintiff offered the testimony of his family doctor, Dr. Bell, as an expert general practitioner. The trial court found that Dr. Bell was not qualified to express an opinion regarding whether treatment would be required from reviewing the CAT scan or the situation of the discs at a particular point on the spine; and that an orthopedist would be better suited to testify as to such matters. The Superior Court, in overturning the trial judge, stated that experts in one area of medicine may be found to be qualified to address other areas of specialization where the specialties overlap in practice. The court noted that Dr. Bell was a board-certified general practitioner who had been practicing medicine for 16 years and had regularly used CAT scan reports in the course of his practice. As a result, the Superior Court ruled:

"Due to Dr. Bell's training and experience, we con-clude that he had a 'reasonable pretension to specialized

knowledge' in the use of CAT scan reports to diagnose and treat patients. The combination of his training and experience with patients who have sustained personal injuries, qualified him to aid the jury in its deliberations." *Chanthavong,* 452 Pa. Super. at 387, 682 A.2d at 338.

The question before the jury in this case was whether Dr. Battistini and the other defendants were negligent in diagnosing and treating an obstructed bowel condition after the hysterectomy. In the present case, Dr. Bitsack is a board-certified general surgeon licensed since 1945, who testified that he has operated on patients with bowel problems approximately once per week. Dr. Struhl had been practicing as a general surgeon for over 40 years, and related that he diagnosed and treated hundreds of bowel obstructions during his career. Dr. Struhl also testified he held privileges in gynecology for over 40 years, although he was not board certified in that specialty. He testified he gained these privileges prior to the establishment of the Board of Obstetrics and Gynecology, and said he had performed numerous hysterectomies, and cared for patients during the postoperative recovery period. He also informed the jury that he served on several medical boards.

Given the liberal standards applied for qualifying an expert, and Drs. Bitsack's and Struhl's training and education, both could aid the jury in its deliberations. Neither doctor inferred that the hysterectomy itself nor any of the GYN-specific treatment was below acceptable standards. In determining the standard of care required for postoperative treatment by any physician who suspects a partially or fully obstructed bowel, an expert in the field of general surgery is in a position to provide an opinion in line with the court's ruling in *Chanthavong, supra.*

## II. EXPERT TESTIMONY NOT BEYOND THE SCOPE OF REPORTS

The defendants further aver that both experts testified beyond the scope of their reports in violation of the Pennsylvania Rules of Civil Procedure 4003.5.

Specifically, Dr. Bitsack testified at trial that there were several things Dr. Battistini neglected to do, which should have been part of the standard of care. Yet, these specific assertions were not part of the expert report. The defendants state that these new allegations caught them at an unfair and prejudicial surprise.

The defendants point us to *Augustine by Augustine v. Delgado,* 332 Pa. Super. 194, 481 A.2d 319 (1984) where the court stated that protecting against unfair surprise of facts and substance of an expert's testimony is the basis for the pretrial report. The defendants argue that because the outcome of the case may have been dependent on the testimony of the experts, it was unfair and prejudicial to allow an expert to testify beyond that which the adversary was prepared to answer based on lack of notice. See also, *Takes v. Metropolitan Edison Co.,* 440 Pa. Super. 101, 655 A.2d 138 (1995); *Pascale v. Hechinger Co. of PA,* 426 Pa. Super. 426, 627 A.2d 750 (1993); *Jones v. Constantino,* 429 Pa. Super. 73, 631 A.2d 1289 (1993).

The question is not simply whether the testimony goes beyond that which is explicitly stated in the expert's report, but whether the testimony goes beyond that which the defendants should have reasonably anticipated, or whether the testimony was, in fact, prejudicial. The report of Dr. Bitsack opined that Dr. Battistini and the medical team violated the standard of care because of their unreasonable delay in diagnosing the herniated bowel, and secondly because of their decision

not to resect that portion of the bowel once it was discovered. This opinion was made on a general level, not regarding the specifics of any of the processes that, if carried out, would have avoided the delay.

Over objection, Dr. Bitsack testified as to his opinion of the postoperative diagnosis of Mrs. Jackson thusly:

"A. Well, if you get a patient with a questionable situation, gynecologic operation, and no evidence to make you think that the problem is related to the gynecologic surgery in the pelvis, then you better get perhaps an opinion, a second opinion, with regard to this problem. And that's where I would be critical. Instead of calling another member of her department, the better thing to do is to call a member of the general surgical department. An experienced person in that regard would certainly be able to offer a more authoritative opinion.

[Defense counsel]: Objection as to scope, Your Honor, of the report.

Court: I'm sorry?

[Defense counsel]: Objection and move to strike with respect to that testimony as it is not—there is nothing in the report that says that.

Court: Overruled. The report reasonably puts you on notice.

[Defense counsel]: I understand. Note my objection.

Court: Overruled.

[Defense counsel]: Thank you.

Q: Doctor, would you refer to the report which is now exhibit 4 on page 6 of the report, the last full paragraph and just quickly read that to yourself and I ask you if that reflects the opinion that you formulated in connection with the care rendered in this case by Dr. Battistini? . . .

A: I agree with that.

Q: And is that still your opinion today, sir?

A: It is, sir.

Q: Would you read that paragraph to the jury?

A: 'The initial delay in reaching a conclusion as to the nature of the obstructive small bowel and, secondly, the failure to resect the questionable six-foot segment of involved bowel led to the picture of sepsis and all of its unfortunate consequences and the ultimate demise of the patient. At the time of the exploration following the pelvic surgery, had the decision been made to resect the bowel, I think that it is reasonable to assume that the patient would not have the complications that she had.' "

This court, relying on the rulings of *Chanthavong, supra,* overruled the objection because the report of Dr. Bitsack was a general one of negligence by delay, and his testimony was not beyond the scope of the report, but merely illuminated what he meant by unreasonable delay.

There was no prejudice to the defendants in that they were able to rebut the opinions of Dr. Bitsack and Dr. Struhl with opposing testimony by their expert witnesses.

The defendants exclaim that Dr. Bitsack went beyond his expert reports when he testified as follows:

(1) Dr. Battistini should have called a general surgical consult prior to the first post-hysterectomy surgery of December 21;

(2) Dr. Battistini should have ordered a CAT scan;

(3) Dr. Battistini should have ordered a CT x-ray;

(4) Dr. Battistini should have performed an abdominal ultrasound; and

(5) Dr. Battistini should have ordered a barium swallow test.

Through testimony of their own experts, the defendants presented evidence to counter these assertions.

The level of testimony offered by the plaintiff's experts did not exceed the boundaries tolerated by the Pennsylvania courts and was not so different in kind from the report to warrant a new trial. In determining whether to admit expert testimony into evidence, a trial judge has wide discretion and will not be reversed unless there has been a clear abuse of discretion. *Greer v. Bryant,* 423 Pa. Super. 608, 621 A.2d 999 (1993).

Pennsylvania courts have consistently provided that experts can expand on and amplify their reports so long as they do not proffer a new theory or present trial testimony inconsistent with the scope of their reports. See *e.g., Chanthavong v. Tran, supra; Beverly v. Kensington Hospital,* 29 Phila. 533 (1995); *Greer v. Bryant,* 423 Pa. Super. 608, 621 A.2d 999 (1993); *Dible v. Vagley,* 417 Pa. Super. 302, 612 A.2d 493 (1992).

Also, the policy behind Pa.R.C.P. 4003.5 is to prevent unfair surprise. The objective is to allow the adverse party an opportunity for meaningful response. The courts have held that there are no definite rules for determining whether the testimony exceeds the fair scope of the report, but must be reviewed on a case by case basis. *Wilkes-Barre Iron & Wire Works Inc. v. Pargas of Wilkes-Barre Inc.,* 348 Pa. Super. 285, 502 A.2d 210 (1985). In *Beverly, supra,* the court noted that the testimony of the expert had "merely provided support for the conclusions set forth in his report." *Id.* at 544. In *Millard v. Nagle,* 402 Pa. Super. 376, 587 A.2d 10 (1991), the Superior Court stated that in deciding whether testimony is within the scope of the report, accent is on the word *fair.* The court stated, " '[f]air' scope contemplates a reasonable explanation

and even an enlargement of the expert's written words." *Id.* at 404, 587 A.2d at 23 (quoting *Wilkes-Barre Iron & Wire Works v. Pargas of Wilkes-Barre,* 348 Pa. Super. 285, 290, 502 A.2d 210, 212-13 (1985). Further, where an expert report was written in absolute language, adverse counsel should have anticipated that the expert's trial testimony would expand on his report. See *Greer, supra.* The question is whether the adversary was misled as to the nature of the appropriate response or whether the adverse party was prevented from preparing a meaningful response. *Beverly, supra.*

The defendant cites as support *Takes v. Metropolitan Edison Co., supra; Jones v. Constantino, supra;* and *Wilkes-Barre Iron & Wire Works, supra,* inter alia. Each of these cases can be distinguished from the case *sub judice* in that the experts in those cases were not simply explaining the particulars of their conclusions in the report, but offering a new theory of liability. In *Takes,* for example, the interrogatory presented to the defendant's expert specifically asked for a description of any tests or experiments to which the expert would testify. The expert listed no tests, but simply discussed Mr. Takes' adherence to the predetermined work plan and steps he could have taken. Under those circumstances, the court ruled he could not later testify about a capacitor's rattle and hum, because it amounted to a test or experiment.

In *Jones,* a doctor's expert report claimed in a general manner that there was no negligence, but the report gave no theory as to how the hepatic duct was cut, only that the injury was "unavoidable and promptly discovered. . . ." Later in trial testimony, the expert said the accident was likely caused by traction. Both the trial judge and the Superior Court took exception to this expanded testimony because the pretrial report

failed to apprise the opposing party of the basis for the expert's ultimate conclusion.

In *Wilkes-Barre,* the expert's report discussed the need for a protective collar around a propane tank, and concluded that if one had been present, the accident would not have happened. At trial, the expert testified that the cylinder was defective because it lacked a *permanently welded on* protective collar, introducing a new theory of defect. The difference is that the opposing party was prepared to present testimony that the cylinder was not defective when it was delivered to the plaintiff because it had a detachable collar (which could have been removed by the plaintiff). The court held that had the opposing party known that the expert would testify that only a permanent collar would make the product safe, he would have prepared a different rebuttal.

In each of the cases cited above, the adversary was given an indication that the theory or testimony would take one road by the report, but verged off onto another unanticipated course during trial testimony. This is what the courts have held to be unfair surprise because it did not allow the opponent to properly prepare a response. That does not mean, however, that the expert report must point out every detail of a theory. In *Jackson v. Robinson and City of Philadelphia,* 21 Phila. 432 (1990), the court stated that an expert's report does not have to mention every piece of evidence relied upon in reaching his conclusion.

In the present case, the defendants were put on notice of the plaintiff's theory against them, namely failure to diagnose the obstructed bowel within a reasonable period of time, and failure to resect a portion of non-viable bowel. As the court stated in *Beverly v. Kensington Hospital, supra* at 547, "if the defendants felt that [the] pretrial report did not provide them with adequate notice

of how [the expert] would testify, they should have conducted more extensive discovery." Likewise, in the present case, if the report by the plaintiff's experts did not provide them with as much specificity as they would have liked, the defendants should have submitted additional interrogatories.

It is reasonable to expect that if the expert states in his report that there was unreasonable delay in diagnosis, he may, at trial, state with specificity how the diagnosis could have been expedited.

In *Chanthavong, supra,* the court had a somewhat similar analysis. The plaintiff's expert submitted a report which concluded a herniated disc. The theory of the plaintiff's case was that the plaintiff had suffered a serious injury as result of the accident. The trial court disallowed the expert to testify about the type of pain and suffering caused by such an injury. Upon reversal, the Superior Court ruled that the trial court had abused its discretion by *not* allowing the expert to testify more specifically about his conclusions in the report. The court stated "it naturally followed that appellant would attempt to establish not only the fact that he had sustained an injury, but also the effects thereof. We cannot see how [the expert's] testimony would have surprised appellee or prevented him from preparing a meaningful response." *Id.* at 389, 682 A.2d at 340.

We adopt this logic and apply these principles to the case at bar.

## III. CONSTITUTIONAL DUE PROCESS

Defendants argue that allowing the experts to testify beyond the scope of their reports violated their right to procedural due process. Specifically, because of a lack of notice as to the nature of the plaintiff's position and testimony, there was a denial of an opportunity

to defend against such evidence and, hence, a constructive lack of due process. The defendant cites as support *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1 (1978); and *First Eastern Bank v. The Campstead Inc.,* 432 Pa. Super. 241, 637 A.2d 1364 (1994).

Notice and the right to be heard is premised on the concept that a party to litigation should be informed of the pending action and the information necessary for that party to present objections and rebuttals. *Pennsylvania Coal Mining Association v. Insurance Department,* 471 Pa. 437, 370 A.2d 685 (1977). What, however, the defendants proffer is akin to revealing the entire opposing party's case, both substance and tone, so that they may properly prepare to answer or object. The protections of due process do not travel this far. The determination of the sufficiency of the evidence may be regulated without denying due process. 7A P.L.E. Constitutional Law §319 (1980). Furthermore, even in those cases where the expert had testified beyond the scope of his report, rendering the decision error, the courts have held that an erroneous decision does not deprive one of due process where the parties have been fully heard. *East Crossroads Center Inc. v. Mellon-Stuart Co.,* 245 F. Supp. 191 (1965).

## IV. DIFFERENT SCHOOLS OF THOUGHT DOCTRINE

The defendants next aver that it was reversible error not to include a charge on the different schools of thought doctrine regarding medical malpractice, as they requested. Specifically, the defendants allege that this court's lack of instructions regarding treatments in which competent medical authority is divided prejudiced the

defendants because enough instruction was not given as to the minority school of thought. *Tobash v. Jones,* 419 Pa. 205, 213 A.2d 588 (1965). The defendant requested the following jury charge:

"A physician may rightfully choose to practice his profession in accordance with a school of thought which differs in its concepts and procedures from another school of thought. Even though the school that he follows is a minority one, he will not be deemed negligent or practicing improperly, so long as it is advocated by a considerable number of reasonable medical experts."

The instructions given by this court were:

"Medical practitioners are not required to exercise the highest possible degree of care and skill, but only that average degree of skill and care possessed by other physicians in their field of practice.

"A physician must base his professional decisions on his knowledge, skill and study and consideration of the particular case.

"In some instances there may be more than one method of treatment for a particular condition. You are instructed that where more than one method of treatment is recognized in a profession, it is not negligence in and of itself for a physician to adopt one of the alternative methods." (N.T. 3/21/97, pp. 19-20.)

It is not necessary for the trial court to follow the standard instructions or to deliver the specific instructions supplied by a party as long as the court fairly and accurately informs the jury of the relevant legal theories and the law when the instructions are read as a whole. See *Butler v. Kiwi S.A.,* 412 Pa. Super. 591, 604 A.2d 270 (1992).

In order to set aside a jury's verdict or grant a new trial based on the jury charge, the instructions must be harmful to the complaining party. *Jistarri v. Nappi,* 378 Pa. Super. 583, 549 A.2d 210 (1988). The jury was instructed that when there is more than one method of treatment recognized in a profession, it is not negligence for a physician to adopt one of those methods.

After reviewing the record, and the charge as a whole, we are of the opinion that we instructed properly. The jury was told that it was not negligence in and of itself for a physician to adopt a particular mode of treatment when there are alternative methods of treatment. This conformed to the evidence that the jury heard. No "majority" versus a "minority" view was presented to the fact-finder.

The question put to the witnesses involved whether there were "two schools of thought" in regard to the diagnosis and treatment of a bowel obstruction post-operatively. The jury was informed that there are. Neither counsel explored with the experts what purports to be a "majority" rule or a "minority" standard for the diagnosing and treating of such a condition. Since this concept was never placed before the jury, we believe it would have been misleading and confusing to charge as requested by the defendants. Ergo, the instruction as given was proper in light of the evidence presented is this area.

## V. REDUCTION OF DAMAGES TO PRESENT WORTH

Next, the defendants aver that despite the ruling by the Pennsylvania Supreme Court in *Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027 (1980), regarding the use of a total offset method for determining future lost earnings, this court committed reversible error be-

cause the Pennsylvania Supreme Court's ruling is based on inaccurate economic theory and contrary to that of other jurisdictions.

The total offset method has been used by the Pennsylvania courts ever since our Supreme Court's ruling in 1980, when it determined that the best approach for determining accurate wage loss was to not discount the award to its present value. *Kaczkowski, supra.* The defendant must have some basis other than the method used by other jurisdictions before this court will ignore a mandate by our highest appellate court.

It has long been the standard in Pennsylvania to adhere to the principles of stare decisis unless it is completely contrary to contemporary ideals or current law and serves only to perpetuate errors. *Mayle v. Pennsylvania Department of Highways,* 479 Pa. 384, 388 A.2d 709 (1978). When a majority of the Pennsylvania Supreme Court members participate in a decision, the rulings in that matter, unless dicta, are binding precedent on the lower courts of this Commonwealth. *Commonwealth v. Mason,* 456 Pa. 602, 322 A.2d 357 (1974).

The fact that other states use a different offset formula does not mean that the formula used by Pennsylvania is economically unsound or that its use by lower courts subjects litigants to such an injustice that stare decisis should be ignored.

## VI. TESTIFYING TO REASONABLE MEDICAL CERTAINTY

Lastly, defendants have averred that they are entitled to j.n.o.v. because the plaintiff's expert testimony did not meet the level of medical certainty required and therefore the jury's verdict was against the weight of the evidence.

Testifying with the required level of certainty need not be expressed in the precise language enunciated by the courts. Testimony must prove to a reasonable medical certainty that, in the expert's professional opinion, the injury was caused by the alleged act. See *e.g., Jackson v. Robinson and City of Philadelphia,* 21 Phila. 432 (1990); *Kravinsky v. Glover,* 263 Pa. Super. 8, 396 A.2d 1349 (1979). The expert's testimony should be reviewed in its entirety to determine if the standard was met. *Kravinsky, supra.* The plaintiff's expert testimony clearly expressed that delay in diagnosis and resectioning of the bowel was the cause of decedent's death. The plaintiff met his burden on this issue by a clear preponderance of the evidence.

Based on all the foregoing reasons, defendants' post-trial request for a new trial or j.n.o.v. was denied.