665 A.2d 478

**I. Leonard HOFFMAN, Appellant,**

**v.**

**Robert A. MOGIL, M.D., F.A.C.S. P.C. and Albert Einstein Medical Center, Appellees.**

Superior Court of Pennsylvania.

Argued March 7, 1995.

Filed Aug. 18, 1995.

Reargument Denied Oct. 27, 1995.

254

Edward H. Rubenstone, Bensalem, for appellant.

George L. Young, Jr., Francis J. McGovern, Plymouth Meeting, for appellees.

Before DEL SOLE, BECK and CERCONE, JJ.

DEL SOLE, Judge.

This is an appeal from an Order denying Appellant's request, contained in his post-trial motions, seeking removal of a non-suit.

In the fall of 1986, Appellee, Robert A. Mogil, M.D., diagnosed Appellant, I. Leonard Hoffman, as suffering from an enlarged prostate. After monitoring Appellant's condition for a couple of months, Appellee recommended that Appellant undergo a trans-urethral prostatectomy, commonly referred to as a "TURP" procedure, and gave him a pamphlet describing what it entailed.[1] Within a week of their discussion, Appellant called Appellee and told him that he was unable to urinate. Appellee met Appellant at the emergency room where he catheterized Appellant and once again recommended that Appellant undergo the TURP procedure.

Appellant was admitted to the hospital a few days later and signed a written consent form authorizing Appellee to perform the procedure. Appellant was taken into the operating room, anesthesia was administered and just as the procedure was to begin, Appellant developed an erection making the procedure impossible. Appellee then decided to perform an alternate form of treatment, a perineal urethrotomy, which required making incisions in Appellant's scrotum and urethra. The procedure was completed and Appellant was catheterized. Approximately one week following the surgery, the catheter was removed and Appellant began to bleed profusely from his penis. Appellee informed Appellant that he was bleeding from the site of his incision and that he would have to undergo

1. The pamphlet given to Appellant by Appellee entitled, "So You're Going to Have a Prostatectomy", by Robert S. Waldbaum, M.D. defines a TURP procedure as, removal of excess prostate tissue through the urethra (i.e. without external incision).

a cauterization procedure the next morning to stop the bleeding. Following the cauterization, Appellant was once again catheterized and was released one week later from the hospital with the catheter still in place. The catheter was removed in Appellee's office two days after Appellant's release from the hospital but several days later, Appellant began to bleed again and he was catheterized for another week. The catheter was then removed and Appellant testified that he has not suffered any further bleeding.

Within a couple of months, Appellant began to experience problems with his urinary stream again and Appellee determined that the problems were caused by strictures, i.e. scarring, that had developed in Appellant's urethra. This diagnosis was confirmed by another physician who performed a cystoscope procedure and a couple of dilations in an effort to alleviate Appellant's problem. Appellant then sought treatment from his expert medical witness, Dr. Joseph Davis, who testified at trial and who performed two in-patient dilations on Appellant. Thereafter, Appellant was treated regularly by a Dr. Rosenthal who continued dilation therapy and performed another cystoscope.

In 1989, Appellant filed suit against Appellee claiming that Appellee's action in performing the perineal urethrotomy and resulting cauterization caused Appellant to develop a stricture and that Appellee acted without Appellant's informed consent in performing the procedures. The trial court granted a non-suit at the close of Appellant's case, post-trial motions were denied and this appeal followed.

Appellant raises the following issues for our review:

1. Did the Court err in granting a non-suit against the Plaintiff based upon a finding that the Plaintiff's proof of the proximate cause of his injuries as a result of the negligent performance of two surgeries on Plaintiff and the performance of one of the surgeries without the Plaintiff's consent, failed to meet the legal standard of proof for submission of the case to a jury?

2. Did the Court err in granting a non-suit against the Plaintiff, in view of the fact that the Defendant exceeded the proper bounds of cross-examination, and thereby waived his right to a non-suit by eliciting matters constituting a legal defense to the Plaintiff's case upon which the lower court relied in granting the non-suit against the Plaintiff?

3. Did the Court err in dismissing Plaintiff's claim that both of the surgeries performed by the Defendant were performed without Plaintiff's informed consent?

Appellant's brief at page 3.

A nonsuit may only be granted where "the plaintiff has failed to establish a right to relief." Pa.R.C.P. No. 230.1 *See also Morena v. South Hills Health System,* 501 Pa. 634, 462 A.2d 680 (1983). In reviewing [a nonsuit] . . . we must view "the evidence adduced on behalf of the plaintiff as true; reading it in the light most favorable to [plaintiff]; giving [plaintiff] the benefit of every reasonable inference that a jury might derive from the evidence and resolving all doubts, if any, in [plaintiff's] favor." *Brannan v. Lankenau Hospital,* 490 Pa. 588, 595, 417 A.2d 196, 199 (1980) (quoting *Auel v. White,* 389 Pa. 208, 210, 132 A.2d 350, 352 (1957)).

*Sinclair by Sinclair v. Block,* 534 Pa. 563, 568, 633 A.2d 1137, 1139 (1993).

In the present case, the trial court held as follows:

In the case at bar, plaintiff failed to present expert testimony establishing any causal connection between the conduct of Dr. Mogil and plaintiff's injury. It is axiomatic that the plaintiff must prove that the defendant's conduct was the proximate cause of the plaintiff's injuries.

\* \* \* \* \* \*

It is incumbent upon the expert to present testimony of sufficient quality and weight as to reflect reasonable medical certainty of the causal nexus. The only exception to the requirement of expert testimony is "where the matter and investigation is so simple and the lack of skill or want of care is so obvious as to be within the range of ordinary

experience or comprehension of even non-professional persons." *Chandler v. Cook*, 438 Pa. 447, 265 A.2d 794 (1970). Since plaintiff's claims are based upon complex medical procedures and treatment such an exception is not applicable in the case at bar.

Plaintiff contends in his Complaint that defendant was careless and negligent in his care and treatment and failed to provide plaintiff with medical care in accordance with accepted medical standards for physicians and specialists in the area of urologic surgery, but expert testimony is necessary to prove that a physician's care is substandard because, absent guidance of an expert, jurors are unable to make a decision with sufficient certainty so as to enable them to make legal judgments. While it is true that plaintiff has developed strictures, it is also true that strictures can develop from a urinary tract infection as Mr. Hoffman had prior to the surgery or they can develop from Foley catheters or simple endoscopic assessment.

Moreover, it was established at trial that plaintiff's expert could not locate the site of the surgical incision made during the perineal urethrotomy or the cauterization, so he could not opine within a reasonable degree of medical certainty that plaintiff's injury is located at the surgical site or that either procedure was the proximate cause of plaintiff's strictures, and expert opinion must not be an "unfounded guess". *Peerless Dying [Dyeing] Co. v. Industrial Risk Co., [Insurers]*, 392 Pa.Super. 434 [573 A.2d 541 (1990)]. The Court cannot presume, or accept as true, inferences that are unwarranted or argumentative. *Greer v. Bryant*, [423 Pa.Super. 608] 621 A.2d 999 (1993). In the instant case, plaintiff failed to meet his burden of providing the necessary causation testimony to relate plaintiff's harm to the conduct of Dr. Mogil, to wit: that plaintiff's stricture is at the site of the surgery, and that the injuries incurred by plaintiff are the direct result of defendant's negligent performance of non-consensual surgeries.

\*　　\*　　\*　　\*　　\*　　\*

... In the case at bar, the plaintiff failed to introduce evidence sufficient to establish the necessary elements to maintain a case of medical malpractice. A plaintiff cannot establish a prima facie case of medical malpractice without, *inter alia*, establishing a causal connection between the defendant's alleged negligence conduct and plaintiff's injury.

Trial Court Opinion at pages 10–14.

■ Expert testimony is vital to establishing a medical malpractice claim.

[A] plaintiff who brings a medical malpractice case in negligence must prove that the act or omission of the physician fell below the standard of care owed the patient. *Branna [Brannan] v. Lankenau Hospital,* 490 Pa. 588, 417 A.2d 196 (1980). This standard must be established by expert testimony. *Lira v. Albert Einstein Medical Center,* 384 Pa.Super. 503, 559 A.2d 550 (1989).

The general rule in this Commonwealth is that in order to establish a cause of action for medical malpractice, the plaintiff must present expert testimony establishing variance from accepted medical practice and that this deviation from community standards caused the plaintiff's injuries.... As in other negligence cases, the plaintiff in a medical malpractice case bears the burden of proving a causal nexus between the wrongful conduct and the injury as part of the prima facie case. The plaintiff's burden of proof on this issue encompasses two separate and distinct burdens.... The first burden, the burden of production, refers to the responsibility of the plaintiff to present evidence of sufficient quality and weight that reasonably intelligent men could believe in the existence of a causal link sought to be established. If the plaintiff fails to satisfy this initial burden, it becomes incumbent upon the trial judge to remove the issue from consideration by the jury, since any decision reached by the jury based on consideration of this evidence would involve an inordinate amount of speculation and conjecture....

*Bowser v. Lee Hospital,* 399 Pa.Super. 332, 340–341, 582 A.2d 369, 373 (1990), *allocatur denied,* 527 Pa. 614, 590 A.2d 755 (1991).

After thoroughly reviewing the record before us, it is clear that the trial court did not err in granting Appellee a compulsory non-suit as it related to Appellant's negligence claim. Appellant failed to establish a causal nexus between his injuries and Appellee's conduct. While Appellant's expert testified that he was able to locate the area of the stricture and that it was his belief that Appellant's injuries stemmed from the operation and subsequent cauterization performed by Appellee, Appellant's expert was unable to identify the site of the surgery, thereby failing to establish the necessary element of causation. Furthermore, as the trial court noted, the testimony offered established that strictures can be caused by a number of factors. Accordingly, we find no error in the trial court's ruling.

■ Appellant also claims that the trial court erred in granting a non-suit because Appellee waived his right to a non-suit when his counsel exceeded the proper bounds of cross-examination by introducing matters constituting a legal defense upon which the lower court relied in granting the non-suit. Appellant argues that during cross-examination, Appellee's counsel improperly asked Dr. Davis whether he could locate the site of the surgery and cauterization. Under direct examination, Dr. Davis testified as follows:

Q. Do you have an opinion—well, before I get to that, from reviewing Doctor Mogil's records of that cauterization surgery, can you determine where the cauterization occurred?

A. Yes.

Q. Where?

A. At the site of the incision in the bulbous urethra.

Q. So, that's the incision that's made after the doctor cuts the skin and he then goes into the urethra, it's that incision, right?

260

A. According to his operative notes, that's where the bleeding was.

N.T. 10–15–93, pp. 89–90.

Under cross-examination, Dr. Davis engaged in the following discussion with defense counsel:

Q. Now, you said in direct examination, Doctor, that in your opinion, first of all, with the cystoscope you actually went up with a cystoscope and saw the stricture; is that right?

A. I saw it by X-ray.

Q. And was it in the bulbous urethra?

A. It was.

Q. Now, you did this in 1990; is that right?

A. Yes.

Q. Surgery was in 1986, right?

A. Yes.

Q. Surgery was in 1986, right?

A. Yes.

Q. Some three and half years later in July of 1990; is that right?

A. Yes.

Q. How are you able to say that the stricture is in the area of the surgery?

A. I could not see the area of the surgery at all because that was a skin incision that I'm sure had healed by then. I could only tell endoscopically and by X-ray.

Q. So, in other words you're saying that generally urologists such as yourself and Doctor Mogil, when you do the perineal urethrotomy, right, you enter the bulbous urethra, right?

A. Yes.

Q. And which is an inch and a half to two inches long?

A. Approximately.

Q. And the stricture was also in the area of the bulbous urethra?

A. Yes.

Q. So, therefore, you are concluding that the stricture was in the area of the surgery?

A. I am concluding that on the basis of the endoscopic appearance, the X-ray, the history, what I knew about this case in terms of his previous surgery, I have to pull it all together.

Q. Well, was there anything that you saw in 1990 that could tell you where the surgery was, that was an objective indication of where the surgery was?

A. Do you mean based on my visualization only without nothing, anything else about the case?

Q. Yes.

A. No, I can't.

Q. Now, you can't tell where the surgery is?

A. I see a scar in a certain particular location. If I knew nothing else about the case, I would have to say that it was a scar in a certain area.

Q. Scar and stricture are the same thing?

A. Yes, sir.

N.T. 10–15–93, pp. 114–116.

\* \* \* \* \* \*

Q. Doctor, in his note of 5/13/87, Doctor Mogil makes a note, "Bulbous stricture proximal to urethrotomy." Now, doesn't that mean that the stricture was above where the urethrotomy was done, doesn't it?

A. If he's using the term proximal meaning above, that is on the bladder. There's a distinction between the bladder side and distal side, that's the way the urologist would do it. In this case, proximal meaning closer to the bladder, distal meaning further away.

Q. Proximal, closer to the bladder, distal meaning further away?

A. In other words, closer to the prostate, meaning proximal, and distal, further away. I don't want to confuse anybody. So, he's saying here bulbous stricture proxi-

mal to urethrotomy meaning that he felt or he looked and saw that the stricture was on the prostate side or closer to the bladder side of the opening.

Q. Isn't that what the note says by the surgeon that when he looked in in 1987, now this is the surgeon who actually did the perineal urethrotomy, that when he looked in and scoped that man, he saw a stricture, and the stricture was above the area where the surgery was? Isn't that what it says?

* * * * * *

Q. Yes or no, isn't that what that indicates?

A. He means that it's on this side of the site where he did the urethrotomy.

Q. Didn't you say meaning closer to the bladder?

A. Yes.

Q. So, the bulbous stricture is proximate or closer to the bladder or above the urethrotomy?

A. That's what he is saying.

Q. So that when he looked at it in 1987, the stricture was not where the surgery was done, the stricture was above the surgery?

A. According to that note, yes.

N.T. 10–15–93, pp. 118–119.

Appellant argues that the trial court's Order was based solely on Dr. Davis' testimony during cross-examination where he stated that he could not locate the site of the prostatectomy and that, therefore, the court erred in granting the non-suit. Our supreme court has held: "where the defendant exceeds proper bounds of cross-examination so as to elicit matters constituting a defense to the cause of action, the trial court is without authority to enter a non-suit." *Atlantic Richfield v. Razumic*, 480 Pa. 366, 382–383, 390 A.2d 736, 744 (1978) [additional citations omitted].

After reviewing Dr. Davis' testimony offered during cross-examination, we are not persuaded that the testimony elicited by defense counsel from Dr. Davis regarding his inability to

locate the site of the prostatectomy and cauterization exceeded the bounds of cross-examination. During direct examination, Dr. Davis testified regarding the area in which he believed the surgery occurred and the location of the stricture. Defense counsel's question of whether or not Dr. Davis was actually able to determine the actual site of the surgery was in keeping with the nature of the questions and answers given during his direct examination. Accordingly, we hold that defense counsel did not introduce defense evidence during his cross-examination of Appellant's witness and, therefore, Appellee did not waive his right to seek a non-suit at the close of Appellant's case relating to negligence. In addition, it is clear that Dr. Davis' inability to locate the site of Appellant's surgery was not the only information relied upon by the trial court in granting the non-suit. The court also considered the fact that other factors may have played a role in the stricture's development.

■ Finally, Appellant alleges that the trial court erred in precluding Appellant from presenting any evidence pertaining to the alleged lack of informed consent.

[I]n determining whether a physician breached his duty to his patient, "the standard of care is not what a reasonable medical practitioner would have done in the situation but whether the physician disclosed those risks which a reasonable man would have considered material to his decision whether or not to undergo treatment." *Festa,* supra. [*Festa v. Greenberg,* 354 Pa.Super. 346, 511 A.2d 1371 (1986) ]. Materiality is established by a two step process. First the trier of fact must be supplied with expert information as to the nature of the harm and the probability of it occurring. However, it is the trier of fact, not the expert, who must decide the materiality of the risk involved and whether the probability of that type of harm is a risk which a reasonable patient would consider in rendering a decision on medical treatment. *Jozsa v. Hottenstein,* 364 Pa.Super. 469, 528 A.2d 606, 608 (1987).

*Clemons v. Tranovich,* 403 Pa.Super. 427, 432, 589 A.2d 260, 262 (1991) citing *Sagala v. Tavares,* 367 Pa.Super. 573, 533 A.2d 165, 167–168 (1987).

In the present case, the trial court granted Appellee's motion in limine to preclude introduction of evidence relating to informed consent. During an in-chambers discussion, the court ruled that the reports supplied by Appellant's expert failed to address the probability of harm resulting from the perineal urethrotomy or the cauterization, and that in the absence of such evidence, it would be error to leave the jury to speculate on the probability of such risks.

While the parties and the trial court analyze this claim as involving a question of informed consent, it is really a question of whether Appellant consented at all to the surgery that was ultimately performed. It is clear from the record that the only surgery that was recommended by Dr. Mogil and consented to by Appellant was the TURP procedure, and accordingly, the only risks that would have been discussed between doctor and patient were those associated with that procedure. To hold, as the trial court did, that a plaintiff should be precluded from presenting evidence to a jury regarding an alleged lack of consent to a surgery that was admittedly not discussed with plaintiff prior to its performance, leads to a ridiculous result and negates the importance of obtaining a patient's consent prior to proceeding on an undiscussed non-emergency procedure. For instance, under the trial court's analysis, a female or male patient who consented to sterilization by means of a tubal ligation or vasectomy would be precluded from presenting a claim of a lack of consent to the jury where, in the absence of any life threatening circumstance and after surgery had begun, the patient's physician chose to accomplish the sterilization by performing a hysterectomy or castration. While sterilization was the ultimate goal of the surgery, it was essential that the patient be informed about the specific procedures, and their attendant risks, that would be undertaken to achieve the desired result. This is consistent with our holding in *Millard v. Nagle,* 402 Pa.Super. 376, 587 A.2d 10 (1991), *aff'd,* 533 Pa. 410, 625 A.2d 641 (1993),

where we stated: "it is imperative to rule that a physician does not have the authority to extend surgical procedures to areas outside the initial consent unless additional consent was expressly obtained, or was implied, or unless an emergency situation existed requiring immediate action to preserve the life or health of the patient." *Id.* at 388, 587 A.2d at 15.

Accordingly, we affirm the trial court's Order granting a compulsory non-suit as it relates to Appellant's claim of negligence and, because we find merit to Appellant's argument regarding lack of consent, we remand this matter back to the trial court for a trial on that claim.

BECK, J., files a concurring and dissenting opinion.

BECK, Judge, concurring and dissenting.

I agree with the majority's conclusion that appellant failed to establish the necessary element of causation in his negligence case against appellee, and therefore join in that portion of the majority opinion affirming the nonsuit on this claim. I also concur in the majority's holding that appellee did not introduce defense evidence during cross-examination of appellant's witness.

I must dissent, however, from the majority's decision to remand this matter for further proceedings on the informed consent claim. Without even addressing the question of whether appellee obtained appellant's informed consent prior to performing the challenged perineal urethrotomy, I would affirm the nonsuit on this claim for the same reason we affirm the nonsuit on the negligence claim. Where surgery is performed without informed consent a technical battery occurs and the physician is liable for "any injuries *resulting from that invasion.*" *Sagala v. Tavares,* 367 Pa.Super. 573, 533 A.2d 165, 169 (1987), *app. den.,* 518 Pa. 626, 541 A.2d 1138 (1988) (emphasis added). A plaintiff in an informed consent action is required to show that he sustained an injury that was caused by the operation; without medical expert testimony establishing the causative element, any jury award in the informed consent action would be speculative and improper. *Maliszew-*

*ski v. Rendon,* 374 Pa.Super. 109, 542 A.2d 170, 173 (1988), *app. den.,* 520 Pa. 617, 554 A.2d 510 (1989).

I therefore would affirm the trial court's grant of nonsuit on the entire case, including the informed consent claim.