# Burke v. Northrup

*Andrew J. Stern,* for plaintiffs.
*William F. Sutton,* for defendants.

MASSIAH-JACKSON, *J.,* May 7, 1999—

## I. PROCEDURAL HISTORY

The plaintiffs, Ronald and Lisa Burke initiated this medical malpractice action following surgery on Mr. Burke performed by Bruce Northrup M.D. and Richard A. Balderston M.D. at Thomas Jefferson University Hospital.[1] The matter was tried before this court and a jury in June 1998. On June 15, 1998, after a week and a half of trial, a jury verdict was rendered in favor of Dr. Northrup and Thomas Jefferson University Hospital. Pursuant to Rule 227.1, Pa.R.C.P., the Burkes filed timely post-trial motions seeking a new trial. Following receipt of the trial transcript, written memoranda were submitted by the parties and oral argument was presented to the court on April 29, 1999.

## II. FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to the verdict winner and giving them the benefit of all reasonable inferences, the following evidence was deduced at trial. See *Sundlun v. Shoemaker,* 421 Pa. Super. 353, 358, 617 A.2d 1330, 1333 (1992).

Mr. Burke, a resident of Indiana, was involved in a serious automobile accident in April 1990. Vol. IV, N.T. 90. As a result of this accident, Mr. Burke sustained injuries to his head, hand and abdomen. Vol. II, N.T. 4. Mr. Burke also experienced pain in his lower back

---

1. In the midst of plaintiffs' case in chief, the plaintiffs took a voluntary nonsuit against Richard A. Balderston M.D. The trial continued against Dr. Northrup and Jefferson Hospital.

and in his left leg. Vol. II, N.T. 5. Gary M. Ayres M.D., Mr. Burke's primary caregiver since 1990, treated Mr. Burke for the injuries he suffered from the accident. Gary M. Ayres M.D.'s video deposition, N.T. 6, 10. After almost a year of treatment, including a sympathectomy, Mr. Burke continued to suffer from back problems and leg pain. He was not able to return to work. Ayres' dep., N.T. 16. Dr. Ayres recommended, with the advice of neurosurgeons, that Mr. Burke seek a consultation at Thomas Jefferson University Hospital. Ayres' dep., N.T. 19.

In the spring of 1991, the Burkes traveled to Philadelphia where tests were performed at Thomas Jefferson University Hospital. Mr. Burke was diagnosed with lumbosacral herniated disc disease. Vol. II, N.T. 7. Mr. Burke was informed that neurosurgical intervention was recommended, to which he agreed. Vol. II, N.T. 8. Bruce A. Northrup M.D., a board certified neurosurgeon at Thomas Jefferson University Hospital, met with the Burkes in late July 1991, to assess Mr. Burke's condition for surgery. Vol. VI, N.T. 18, 31, 33.

Mr. Burke was admitted to Jefferson Hospital on August 7, 1991, under Dr. Northrup's service. Vol. VI, N.T. 35. Dr. Northrup had responsibility for Mr. Burke's overall care, which included determining the preoperative and intraoperative doses of antibiotics. Vol. VI, N.T. 180-81. The surgery was performed on August 8, 1991 by Dr. Northrup and Dr. Balderston. Vol. II, N.T. 11; vol. VI, N.T. 36. Dr. Northrup's surgical duties involved exposing the spine, decompressing the spine, and removing two items: (1) the lamina (the part of the bone in the back of the spine), and (2) the ligaments which were compressing the nerves. Vol. VI, N.T. 36. Dr. Balderston installed metal hardware to support the spine.

Dr. Northrup administered one gram of the antibiotic Ancef to Mr. Burke before the surgery began. Vol. VI, N.T. 48. Another gram of Ancef was administered to Mr. Burke after the surgery was completed and again throughout a 24-hour period. Vol. V, N.T. 180. The surgery as performed was successful. Mr. Burke was discharged from the hospital on Saturday, August 17, 1991.

Plaintiffs testified that on August 13, 1991, Mr. Burke complained of pain at the surgical site. Vol. II, N.T. 12-14, 17, 25-26; vol. IV, N.T. 98. The medical records indicated that Mr. Burke's incision was clean and dry at that time. Vol. VI, N.T. 56, 59, 61. The last note in Mr. Burke's chart on August 15, 1991 revealed that Mr. Burke was mobile, taking oral medication, had a dry, clean wound and was without fever. A discharge plan was initiated. Vol. VI, N.T. 63. Lisa Burke stated that she did not notice any drainage from the wound a week after the surgery. Vol. II, N.T. 52. Because Mr. Burke was able to walk and his pain was being controlled by oral medications, Dr. Northrup determined that it was appropriate to discharge Mr. Burke on August 17, 1991. Vol. VI, N.T. 69.

On August 21, 1991, Mr. Burke's sutures were removed at Dr. Paul Hamary's office, a physician in Indiana. Vol. II, N.T. 26. Mrs. Burke stated that she did not see any redness or drainage of the wound during the removal of the sutures, vol. II, N.T. 67, nor did Dr. Hamary inform the Burkes that there was anything suspicious concerning the wound. Vol. II, N.T. 67.

On August 23, 1991, six days after leaving Jefferson Hospital, Mr. Burke went to an emergency room at Methodist Hospital in Indiana because he had a temperature, a headache and back pain. Vol. II, N.T. 29-31,

68-69. His back was examined, blood studies taken and then he was sent home.

Mr. Burke testified that he went to St. Vincent's Hospital in Indiana on August 26, 1991 to see Dr. John L. Beghin in order to have his wound cultured. Vol. IV, N.T. 106. In the process of the culture being conducted, Mr. Burke was informed that the wound had opened. Vol. IV, N.T. 107. He was hospitalized and treated for a staph infection. Vol. IV, N.T. 108.

Plaintiffs presented Dr. Jonathan Kersun as a witness by reading portions of his deposition. Vol. V, N.T. 205. Dr. Kersun was a medical resident at Thomas Jefferson University Hospital in 1991. His testimony was: "The patient on the evening of August 16, 1991, was very stable and doing very well, postoperatively. And there was no really uneventful or remarkable thing about the postoperative course that would lead me to suspect that anything might be wrong within the next 12 hours that he was in the hospital." Vol. V, N.T. 221. Dr. Kersun also stated that persistent pain is common in the postoperative course of some patients. Vol. V, N.T. 222.

The Burkes presented two expert witnesses: Dr. Beth Raucher, an internist at Beth Israel Medical Center, New York, specializing in infection control and infectious diseases, and Dr. Carl Manders, a neurological surgeon in private practice in Indianapolis, Indiana. Vol. II, N.T. 88; vol. III, N.T. 14. Dr. Raucher testified as an expert regarding the proper standard of care to follow with respect to the prevention, diagnosis and treatment of infectious disease. Vol. II, N.T. 96. Dr. Raucher stated that Dr. Northrup deviated from the standard of care when he ordered Mr. Burke to be provided with only one gram of antibiotic and failed to give a second dose of antibiotic during surgery. Vol. II, N.T. 112. Based on her research, Dr. Raucher testified that Mr. Burke,

because of his large size, should have received a loading dose of two grams of Ancef. Vol. II, N.T. 107.

Dr. Raucher admitted on cross-examination that the authority she relied upon, an article written by Dr. David Williams, stated that "the usual dose" of antibiotic given to a patient is one gram. Vol. II, N.T. 174-75. She also acknowledged that Dr. Williams did not write about adjusting the dosage because of the patient's weight, nor did he discuss whether the patient should receive a repeat dose. Vol. II, N.T. 175.

Dr. Raucher agreed that Mr. Burke had several good signs postoperatively. She stated that Mr. Burke never had redness at the surgical site, which can be a sign of a deep wound infection. Vol. II, N.T. 180. Dr. Raucher also testified, based on her review of Mr. Burke's record, that Mr. Burke's wound was dry and intact, an indication that the wound was healing. Vol. II, N.T. 180. She commented that these signs continued until Mr. Burke's discharge from Thomas Jefferson University Hospital. Vol. II, N.T. 181.

Dr. Manders opined that Dr. Northrup's failure to provide an initial dose of two grams and an intraoperative dose of antibiotics during surgery was a deviation from the standard of care. Vol. III, N.T. 41-42. Dr. Manders stated that the standard of care when doing a laminectomy, especially with metal instruments, is to give antibiotics during the time the wound is open. Vol. III, N.T. 38. Dr. Manders opined that if the procedure is prolonged, which is any surgery which lasts over four hours, then the standard of care is to give another dose of antibiotics. Vol. III, N.T. 38-39. Because of Mr. Burke's large size, Dr. Manders testified that the standard of care in this case would have been to give two grams of antibiotic to Mr. Burke before the surgery began. Vol. III, N.T. 38. Dr. Manders agreed

that it is within the standard of care to continue to give antibiotics for a period of 24 or 48 hours. Vol. III, N.T. 42.

Dr. Manders testified that the signs of a deep wound infection are an increase in back pain and incisional pain, changes in blood count and an elevated temperature. Vol. III, N.T. 47. Dr. Manders stated that Mr. Burke did exhibit some of these signs, especially during the last days of his hospital stay. Vol. III, N.T. 48. Because Mr. Burke was on Percocet and Tylenol, Dr. Manders stated that Mr. Burke's real temperature was not being determined. Vol. III, N.T. 48.

Dr. Manders further testified that Dr. Northrup deviated from the standard of care by permitting Mr. Burke's discharge on August 17, 1991. Vol. III, N.T. 54. Factors such as Mr. Burke having an elevated white blood count, his complaint of back pain and the seemingly elevated temperature should have delayed Mr. Burke's discharge. Vol. III, N.T. 54. Dr. Manders testified that if Mr. Burke was to be discharged on August 17, 1991, then he should have been directed to a specialist in Indiana within 24 hours of his return home. Vol. III, N.T. 55. The patient was diagnosed with a deep wound infection on August 26, 1991. Vol. III, N.T. 57. Dr. Manders opined that as a result of the deviations from the standard of care, Mr. Burke suffers from radiculopathy, polyneuropathy, unstable spine and osteomyelitis. Vol. III, N.T. 64.

Dr. Manders acknowledged that Mr. Burke's temperature on August 16, 1991 was 98 degrees, with his maximum temperature being 99 degrees. Vol. III, N.T. 74. He confirmed that the appearance of Mr. Burke's wound was clean, dry and intact on the day he was discharged, August 17, 1991. Dr. Manders read the note in Mr. Burke's record from Dr. Hamary, the doctor

who removed Mr. Burke's sutures on August 21, which commented that normal recovery was going on with the wound. Vol. III, N.T. 81.

Dr. Northrup and Thomas Jefferson University Hospital presented Mark Ingerman M.D. as an expert in infectious disease medicine. Vol. V, N.T. 37. Dr. Ingerman testified to a reasonable degree of medical certainty that Dr. Northrup's treatment of Mr. Burke was appropriate. Vol. V, N.T. 46.

Dr. Ingerman testified that Dr. Northrup did not deviate from the standard of care by not giving a second dose of Ancef during the operation. Vol. V, N.T. 70. The standard in hospitals, as maintained by Dr. Ingerman, is to administer one gram of Ancef two hours prior to surgery regardless of the patient's size. Vol. V, N.T. 68, 72, 152. The administering of an additional antibiotic within an operative period is at the discretion of the operating physician. Vol. V, N.T. 72.

Basing his opinion on the review of Mr. Burke's records, Dr. Ingerman testified that Mr. Burke's discharge on August 17, 1991 from Thomas Jefferson University Hospital was appropriate. Vol. V, N.T. 46, 48. Mr. Burke's complaint of pain at the surgical site, his temperature reading of 99.1 and his white blood count reading of 11.1 were the factors Dr. Ingerman considered in reaching his conclusion. Vol. V, N.T. 61. Mr. Burke's temperature of 99.1 was insignificant to indicate Mr. Burke had an infection, because Dr. Ingerman determined that Mr. Burke's temperature was within the normal range after an operation. Vol. V, N.T. 50, 52. Dr. Ingerman opined there were no abnormalities which suggested that a deep wound infection existed. Vol. V, N.T. 48. The plaintiff's temperature curve was so benign that there was no indication, at that time, that the patient had an infection. Vol. V, N.T. 51. Dr. Ingerman

related that most post-surgical patients receive pain control with Tylenol or Tylenol-Plus, a codeine preparation. Vol. V, N.T. 54. A sign of concern may exist, according to Dr. Ingerman, if the patient's temperature rises to a higher level such as 100.1 or 101. Vol. V, N.T. 54. In order to detect if a patient may have a deep wound infection, Dr. Ingerman explained that the patient would have to have an increased temperature and that there would have to be more signs than those listed in Mr. Burke's chart. Vol. V, N.T. 55.

Dr. Ingerman stated that if Mr. Burke had a deep wound infection during his stay at Thomas Jefferson University Hospital, then his temperature would have been higher than recorded regardless of the amount of Percocet he consumed. Vol. V, N.T. 96. If Mr. Burke had a deep-seated infection with a staph aureus, not only would he have a significant fever but he would exhibit other problems, such as pus. Vol. V, N.T. 109-110.

Dr. Ingerman testified that Mr. Burke's white blood count was within the normal standard. Vol. V, N.T. 56. He further explained that an increased white blood count does not always mean that there is an infection, but may also be a sign of stress or strain. Vol. V, N.T. 56. Dr. Ingerman maintained that Mr. Burke's assessment from the records did not indicate that there was an active ongoing deep-seated infection that needed continued hospitalization or intervention. Vol. V, N.T. 117. He said that a temperature over 100.6, a significantly elevated white blood count, drainage from a wound, redness from a wound, and a change in the character of the pain are indicative of a deep wound infection. Vol. V, N.T. 64.

Dr. Donald Long, a neurosurgeon and director of the department of neurosurgery at Johns Hopkins Hos-

pital, was offered by the defendants as an expert in neurosurgery. Vol. V, N.T. 161. Dr. Long testified that the standard of care for this type of surgery is to give one gram of the antibiotic, Ancef, 30 minutes before surgery. Vol. V, N.T. 172. He stated that Ancef should be used for an additional 24 hours and then discontinued. Vol. V, N.T. 174. Dr. Long testified that a repeat dose of antibiotic should be given six to eight hours after the first dose. Vol. V, N.T. 179. Dr. Long averred that Mr. Burke's receipt of the initial dose of Ancef at 10:45 a.m. and a second dose at or around 7:30 p.m. was consistent with the standard of care because the dosage was given within an eight-hour period. Vol. V, N.T. 180. Dr. Long stated that the surgeon may choose to give an additional dose during surgery if the operation lasts longer than six to eight hours. Vol. V, N.T. 180.

Dr. Long also testified that Mr. Burke's discharge was within the standard of care. Vol. V, N.T. 182. Factors such as a temperature in the normal range, a white blood count which was not elevated and a clean, dry wound led Dr. Long to conclude that Mr. Burke's discharge was proper. Vol. V, N.T. 182. Dr. Long testified that he would not consider an abnormal platelet count as a sign of infection, vol. V, N.T. 189; that Mr. Burke's request for additional or increased medication was not unusual because the pump previously used to deliver medication had been removed, vol. V, N.T. 198; and that it is common for a patient to experience significant postoperative pain with this type of operation. Vol. V, N.T. 199.

The defendant-doctor testified that it was within the standard of care to give a preoperative dose of one gram of Ancef. Vol. VI, N.T. 47. In order to determine that dosage amount, Dr. Northrup followed the recommendation of pharmacologists of a one gram dose

of antibiotic. Vol. VI, N.T. 46. Based on readings and conferences, Dr. Northrup stated that he was also aware that other specialists in his field use one gram as a loading dose. Vol. VI, N.T. 47. This is the standard dose because the drug is given to the lean body mass, and even if the patient gains weight, the lean body mass remains the same. Vol. VI, N.T. 174.

Dr. Northrup further testified that Ancef has a very long half-life and therefore can be given in eight-hour intervals. Vol. VI, N.T. 48, 185. Dr. Northrup stated that he administers a repeat dose of Ancef if an operation lasts longer than eight hours, which is consistent with the standard of care for the hospital. Vol. VI, N.T. 48. He acknowledged that the standard of care may not apply to other specialists who may have different regimens. Vol. VI, N.T. 48. Dr. Northrup agreed that infection is a risk of this type of operation. Vol. VI, N.T. 68. The defendant testified that there were no studies to date which show a benefit to giving two grams of Ancef as a loading dose and then giving a repeat dose intraoperatively. Vol. VI, N.T. 74.

Dr. Northrup noted that Mr. Burke had an impressive history of pain medication. As of July 1991, Mr. Burke was taking an oral form of morphine every eight hours. Vol. VI, N.T. 31. A significant amount of medication would also be needed during the patient's hospitalization. Vol. VI, N.T. 51. The progress notes of August 10, 1991 indicated that Mr. Burke had no complaints. Vol. VI, N.T. 55. Dr. Northrup visited the patient on August 12, 1991 and noted that the incision was clean and dry. Vol. VI, N.T. 56. The PCA pump, a manual patient-controlled pump, which Mr. Burke used for medication was removed on August 12, 1991. Vol. VI, N.T. 58. The next day, Mr. Burke began complaining of pain. He did not have a fever and his wound was

dry and intact. Vol. VI, N.T. 59. On August 13, 1991, Mr. Burke was visited by Dr. Giancarlo Romano, a neurosurgeon, who noted that Mr. Burke complained of pain, but his appetite was improving. Vol. VI, N.T. 61. Dr. Northrup testified that Mr. Burke's appetite improvement was a good sign because patients who are sick and feverish generally do not have an appetite. Vol. VI, N.T. 61. Mr. Burke's medical record indicated that on August 15, 1991, Mr. Burke was seen by Dr. Burrelat, who noted that Mr. Burke had increased mobility, ambulated well and the incision was clean. Vol. VI, N.T. 62.

Dr. Northrup also reviewed the circumstances of Mr. Burke's discharge from Thomas Jefferson University Hospital. Dr. Northrup explained that there was no reason to order an infectious disease consult for Mr. Burke, because there was no indication in Mr. Burke's chart of any drainage from Mr. Burke's wound. Vol. VI, N.T. 70, 221. Mr. Burke's temperature reading of 99 degrees or 99.1 degrees was within the range of a person who had an operation of this magnitude. Vol. VI, N.T. 70. Dr. Northrup further testified that although Mr. Burke's blood count was elevated, it would only be significant if it was in the range of 14,000 or 18,000 rather than 11,000, vol. VI, N.T. 71; accordingly, it was appropriate for the patient to go home. Vol. VI, N.T. 222.

## III. LEGAL DISCUSSION

The plaintiffs have raised several issues in support of their motions for a new trial.

The decision whether or not to award a new trial lies within the sound discretion of the trial court. *Coker v. S.M. Flickinger Co. Inc.,* 533 Pa. 441, 625 A.2d 1181 (1993). A new trial may be awarded if the trial court clearly and palpably abused its discretion or com-

mitted an error of law which controlled the outcome of the case. *E.g., Stevenson v. General Motors Corporation,* 513 Pa. 411, 521 A.2d 413 (1987); *Eldridge v. Melcher,* 226 Pa. Super. 381, 313 A.2d 750 (1973). When evidentiary rulings are the basis of the request for a new trial, the jury's judgment will not be disturbed if it has not been shown that the rulings were harmful to the party complaining. *Romeo v. Manuel,* 703 A.2d 530 (Pa. Super. 1997); *Childers v. Power Line Equipment Rentals Inc.,* 452 Pa. Super. 94, 681 A.2d 201 (1996).

After careful review of the trial rulings, the record reveals that the plaintiffs have been unable to establish a basis upon which a new trial should be ordered. Accordingly, the motions will be denied.

### A. *The Defendant Doctor Northrup's Testimony Was Well Within His Scope of Knowledge and Experience*

The plaintiffs contend that the jury should not have heard testimony from Dr. Northrup that Mr. Burke's white blood count on August 23, 1991 was 7,000, "a normal white count," vol. VI, N.T. 105; that Mr. Burke "had a normal platelet count" on August 23, 1991, vol. VI, N.T. 106; that if Mr. Burke had been at Jefferson Hospital on August 23, 1991, that the blood count and platelet count would most likely have been the same, vol. VI, N.T. 106; and that the most likely cause of Mr. Burke's peripheral neuropathy (loss of sensation in his feet) in 1997 was diabetes. Vol. VI, N.T. 111-12; post-trial brief, pp. 11-13.

The theory asserted by the Burkes is that the defendant-doctor should have provided a written expert report before trial. Post-trial brief, p. 12:

"To the extent a defendant-physician's opinion and knowledge are 'acquired or developed in anticipation of litigation,' and represent 'the work product of a well-prepared litigant,' the defendant must comply with Rule 4003.5." See *Neal by Neal v. Lu,* 365 Pa. Super. 464, 530 A.2d 103 (1987).

The plaintiffs claim at page 13 of their brief and at post-trial argument that they were "surprised" by the testimony. Their claim, however, is unsupported in this record, which reveals that Ronald and Lisa Burke's medical witnesses presented these issues for the jury's consideration throughout their case in chief.

Dr. Raucher testified that a white blood count of 7,000 on August 23, 1991 was a "normal white blood cell count." Vol. II, N.T. 147-48. Dr. Manders confirmed Ronald Burke's diagnosis of diabetes, vol. III, N.T. 69; confirmed that on August 23, Mr. Burke had a normal temperature, normal white blood cell count and normal platelet count, vol. III, N.T. 77-78; and confirmed that even if Mr. Burke had remained at Thomas Jefferson University Hospital for several additional days, there was no evidence that the appearance of the wound would have deteriorated or that Mr. Burke would have been feverish while an inpatient. Vol. III, N.T. 82-83.

Mr. Burke's treating physician in Indiana, Dr. Ayres, testified that Ronald Burke had endocrine problems as early as 1990, including Graves disease and glandular problems. He stated that diabetes was diagnosed in 1992. Ayres dep., N.T. 29, 53, 78, 85. This physician told the jury that the plaintiff suffered from ongoing polyneuropathy and parathesias (unusual and abnormal sensations in the extremities); that before the 1991 surgery Mr. Burke had trouble walking and had lost feeling in his feet, Ayres dep., N.T. 90-91, 133-35; and that while Dr. Ayres considered the possibility that the cause

was Mr. Burke's diabetes, Dr. Josephson, a neurologist in Indianapolis, believed the polyneuropathy and neuropathy was due to an unstable spine. Ayres dep., N.T. 46-47.

Significantly, both plaintiffs' expert, Dr. Manders, and the defense expert, Dr. Long, agreed that when a patient is making a normal recovery, where the wound shows no signs of redness or draining, the patient should be sent home to avoid nosocomial infections (new infections acquired at the hospital). Vol. III, N.T. 83, 85; vol. V, N.T. 185.

The honorable Superior Court has recently reiterated that a physician who is a defendant may testify about his opinion and judgment on his own behalf without the filing of an expert's report. The defendant-doctor's testimony may include facts, opinions and inferences which are rationally based on the witness' perceptions. *Brady v. Ballay, Thornton, Maloney Medical Associates Inc.,* 704 A.2d 1076, 1082 (Pa. Super. 1997); *Havasy v. Resnick,* 415 Pa. Super. 480, 495, 609 A.2d 1326, 1333 (1992). Accordingly, when Dr. Northrup presented his testimony founded in part on the opinions of other experts, after listening to the testimony at trial and helpful to provide the jury with a clear understanding of his defense, there was no error. *E.g., Tobash v. Jones,* 419 Pa. 205, 213 A.2d 588 (1965); *Brady v. Ballay, Thornton, Maloney Medical Associates Inc., supra; Butler v. Kiwi S.A.,* 412 Pa. Super. 591, 604 A.2d 270 (1992).

The triers of fact were aware that there were questions about the effect of Mr. Burke's diabetes on his recovery, and questions about the post-discharge period in Indiana.

Thus, Dr. Northrup's testimony did not prejudice the plaintiffs nor present new information to the jury.[2]

The Burkes also contend that their cross-examination of the defendant-doctor was improperly limited when an objection was sustained, thus precluding comments about a footnote in a 1995 article written by Dr. Northrup.

At trial, vol. VI, N.T. 179-80, the plaintiffs sought "to impeach the doctor's credibility" by referring to an article, cited in Dr. Northrup's footnote, which was written in 1993 by two members of the department of pharmacology at the University of Kentucky. The pharmacologists commented that antibiotic "readministration" during certain operations exceeding three hours was recommended.

At this post-trial juncture, the plaintiffs set forth a new and expanded basis for a new trial. That is, that the 1993 article, which related to a different type of spinal surgery, would have demonstrated that Dr. Northrup deviated from the standards of care in antibiotic administration in operations *other than Mr. Burke's.* Post-trial brief, p. 9:

"Dr. Northrup testified that his rate of wound infection with respect to the laminectomy he performed on Mr.

---

2. In fact, this jury learned from the plaintiffs' expert, Dr. Manders, that after the April 1990 automobile accident and before this August 1991 surgery, Ronald Burke had "extensive treatments for reflex sympathetic dystrophy." This disease causes patients to complain about "swelling, tingling, numbness," usually involving an extremity. "The normal pain recovery doesn't occur." Vol. III, N.T. 27-28. Plaintiffs' evidence added yet another possible cause for Ronald Burke's problems. See *Brady v. Ballay, Thornton, Maloney Medical Associates Inc.,* 704 A.2d 1076, 1083 (Pa. Super. 1997) (holding that in the absence of unfair surprise, it is up to the jury to weigh conflicting expert testimony).

Burke was 2-3 percent. (N.T. 6/11/98 p. 69.) He acknowledged on cross-examination that his risk of infection with respect to the type of surgery discussed in the referenced article was a fraction of that, about 1/2 percent. (N.T. 6/11/98 p. 177.) Plaintiffs' counsel wanted to show that even for the latter, less invasive surgery, the recommended standard was nonetheless to give a repeat dose of Ancef every three hours and, therefore, Dr. Northrup's practice of not giving a repeat dose of Ancef even when performing a laminectomy could not represent the standard of care.

"This would have impeached Dr. Northrup's testimony and credibility in general, and, more specifically, with respect to whether his practice is still the standard of care today (N.T. 6/11/98 p. 28) and with respect to whether the antibiotic regimen used in operating upon Mr. Burke 'is . . . the majority view (N.T. 6/11/98 p. 104).' "

The burden of the plaintiffs in this litigation was to establish a deviation by Dr. Northrup in a 1991 neurosurgical procedure performed in Philadelphia on Ronald Burke. It was not whether in 1993 or 1995 or 1998 the physician administered intraoperative doses of an antibiotic for a different, less invasive surgery. The record clearly reveals that the plaintiffs questioned Dr. Northrup in their case in chief, and again had full and fair opportunity to extensively cross-examine the defendant. Vol. IV, N.T. 174-76; vol. VI, N.T. 160-228, 231-33.

B. *In the Absence of Direct or Circumstantial Evidence That Dr. Northrup Could Not Understand the Hospital Chart in 1991, His Negligence Cannot Be Inferred*

At trial, the court granted a motion for nonsuit and held that the fact that the nurses listed the patient's

medications in the daily hospital notes and not on the medication chart was not evidence of negligence by the defendant-hospital in the absence of expert testimony linking this deviation of the standard of charting to any harm to Mr. Burke. Vol. VI, N.T. 135-38, 143-50, 155-59; *Hoffman v. Mogil,* 445 Pa. Super. 252, 665 A.2d 478 (1995).

During the charging conference and prior to closing arguments, the court ruled that the nurses' conduct could not be used to infer or suggest negligence by Dr. Northrup. Vol. VII, N.T. 54-55.

Even at this juncture, the plaintiffs are not able to point to *any evidence* that in August 1991, Dr. Northrup was unaware of Mr. Burke's medications or that he was unable to locate the information in the hospital chart.

Notwithstanding the absence of direct or circumstantial evidence relating to 1991, the plaintiffs' contention for new trial is based on their position that because at deposition proceedings after 1993, and at the 1998 trial, certain witnesses did not promptly locate Mr. Burke's medication information in the hospital records, then this "was important circumstantial evidence that [in 1991] Dr. Northrup did not know what was going on with Mr. Burke and negligently discharged him in the face of a developing infection." Reply brief, p. 7; plaintiffs' post-trial brief, p. 6; vol. VI, N.T. 147-49.

The brief of the defendants exhaustively and appropriately covers this issue at pages 5 through 17, and is adopted by this post-trial court. This court declines to presume, or accept as true, inferences that are speculative, unwarranted or argumentative. *Hoffman v. Mogil, supra* at 257, 665 A.2d at 481, citing *Greer v. Bryant,* 423 Pa. Super. 608, 621 A.2d 999 (1993).

## C. *The Jury Charge Conformed to the Law and the Evidence*

These plaintiffs next contend that the jury should not have been charged with Pennsylvania Suggested Standard Civil Jury Instruction 10.04, "Differing schools of thought doctrine"; vol. VII, N.T. 186-87. The post-trial memorandum is limited to whether Dr. Northrup's decision to give a second dose of antibiotics at about 7:30 p.m. on August 8, 1991 was properly the subject of this jury instruction. Specifically, the Burkes allege that the defendant did not provide adequate factual support for the defense that a considerable number of professionals agree with Dr. Northrup's method of treatment. Post-trial brief, pp. 10-11; reply brief, pp. 12-15. The record does not support this argument.

On August 8, 1991, Dr. Northrup administered a pre-operative dose of Ancef, an antibiotic, at about 10:45 a.m. The operation lasted about six hours, from about 12:30 p.m. to 6:30 p.m. The next dose of Ancef was given to Mr. Burke at about 7:30 p.m. Vol. V, N.T. 175-81.

Both of plaintiffs' experts testified to one school of thought, which was that the second dose of antibiotics should be administered during the surgery itself, "while the wound is still open," (Raucher) Vol. II, N.T. 113; "when the bugs are going to get in there." (Manders) Vol. III, N.T. 38-40.

Dr. Northrup and his experts testified about a second school of thought, which was that as long as the second dose of antibiotics was administered within eight hours after the first dose there was no requirement that the operation be ongoing. Vol. V, N.T. 70, 139-44, 151-52, 179-81; vol. VI, N.T. 46-49, 103-104.

The case law is clear that a trial court may not make it burdensome on a defendant-doctor to provide the factual reasons to support his claim that there are a considerable number of professionals who agree with the treatment employed by the defendant. *E.g., Jones v. Chidester,* 531 Pa. 31, 610 A.2d 964 (1992).

In *Gala v. Hamilton,* 552 Pa. 466, 472, 715 A.2d 1108, 1111 (1998), the Supreme Court held that, "limiting evidence . . . would have the effect of preventing expert witnesses from testifying to the existence of a school of thought based on their experience as practitioners and on information they obtained during their medical training and while attending lectures and other educational programs sponsored by institutions and professional societies."

In *Romeo v. Manuel,* 703 A.2d 530 (Pa. Super. 1997), as in the instant case, the defendant-doctor himself testified about a second school of thought relating to a cardiac treatment. The appellate court agreed that his testimony was relevant and appropriate.

Dr. Northrup provided the factual basis for his opinion that there is an eight-hour window for the second dose. He explained this opinion was shared by medical people he spoke to, specifically at conferences with neurosurgeons, bacteriologists and hospital epidemiologists. He and the pharmacologists considered the "pharmacodynamics" of Ancef. Vol. VI, N.T. 46-48. Further, he has conferred with other specialists in his field at meetings and conferences. Vol. VI, N.T. 103-104.

Dr. Ingerman referred to medical literature proferred by the plaintiffs as one basis for his opinions. Vol. V, N.T. 152. Dr. Long's expertise in the field of neurosurgery, and in particular the standard of care in the manner in which antibiotic prophylaxis should be used

during Mr. Burke's surgery, was not challenged by the plaintiffs. Vol. V, N.T. 169.

The trial court heard extensive oral argument at vol. VI, N.T. 75-103; vol. VII, N.T. 19-25. Dr. Northrup and the other two experts provided sufficient factual basis to warrant an instruction to the jury on two schools of thought. It was up to the jury to determine whether the defendant met his burden of proof. *Gala v. Hamilton, supra; Sinclair by Sinclair v. Block,* 534 Pa. 563, 633 A.2d 1137 (1993).

Finally, the plaintiffs now object that in response to a jury question during deliberations, the trial court re-read the same instruction it had earlier been read to the jurors.

At vol. VII, N.T. 202-203, the question was read to counsel:

"Your honor, would you please restate the third charge of negligence? One, antibiotic use. Two, time of discharge. Three, question mark."

Plaintiffs' counsel and the court agreed that the only portion of the initial jury charge which "actually got into . . . one, two and three," was the two schools of thought charge. Vol. VII, N.T. 203. Accordingly, the court determined that the same language which earlier had been very carefully crafted by both attorneys, vol. VII, N.T. 24-27, would be read to the jury in response to their question.

When the attorney for the Burkes suggested that other, additional aspects of the case should be commented on by the court, the defense objection was sustained. The trial court did agree, however, that if the jury asked for further information, then it would be provided. Vol. VII, N.T. 206-207. It was clear that the jury was not seeking supplemental information at that point.

The Commonwealth Court has noted in *Smick v. City of Philadelphia,* 161 Pa. Commw. 622, 631, 638 A.2d 287, 291 (1994):

"Where a jury returns on its own motion and indicates confusion, the court has the duty to give such additional instructions on the law as the court may think necessary to clarify the jury's doubt or confusion. *Worthington v. Oberhuber,* 419 Pa. 561, 215 A.2d 621 (1966).This rule commits to the sound discretion of the trial judge the scope of such additional instructions as he or she decides to give to a jury that has expressed confusion. *Mendenhall v. PennDOT,* 113 Pa. Commw. 550, 537 A.2d 951 [1988], *appeal denied,* 520 Pa. 610, 553 A.2d 971 (1988)."

In the Burkes' case the trial court confined the additional instruction to the precise question posed by the jury, believing that such instruction answered the jury's inquiry. *Valentine v. Acme Markets Inc.,* 455 Pa. Super. 256, 264, 687 A.2d 1157, 1161 (1997).

## IV. CONCLUSION

A new trial is appropriate if, after a careful review of the entire record, there has been a manifest abuse of the trial judge's discretion or clear error of law which controls the outcome of the case. This record reveals no basis for a new trial.

For all of the reasons set forth in this memorandum of law, the plaintiffs' motions for a new trial are denied.

## ORDER

And now, May 7, 1999, after consideration of plaintiffs' motions for a new trial and responses thereto, and after oral argument, and for the reasons set forth

in the memorandum of law filed by the court this date, it is hereby ordered that the motions are denied.

Judgment shall be entered in favor of Bruce Northrup M.D. and Thomas Jefferson University Hospital.