# Hines v. Kosseim

*Michael Troiani* and *Robert Stein,* for plaintiff.
*Charles A. Fitzpatrick III* and *Arthur B. Keppel,* for defendant.

QUIÑONES ALEJANDRO, *J.,* August 15, 2005—

## INTRODUCTION

On October 1, 2002, Gilbert Hines (plaintiff) filed a medical malpractice and professional liability civil action against Laura Kosseim M.D., Aba Barden Maja M.D., Joseph Ravenal M.D. and Penn Center for Primary Care, alleging negligence in failing to timely diagnose his prostate cancer. On March 10, 2004, defendants Barden, Ravenal and Penn Center for Primary Care were dismissed as party defendants, and the case proceeded against *only* Dr. Kosseim (defendant).

On January 28, 2005, the trial jury found in favor of plaintiff and against defendant. Thereafter, defendant filed a post-trial motion for judgment n.o.v. and/or a new trial which was denied by this trial judge. Dissatisfied with the ruling, defendant filed this appeal.

## RELEVANT FACTUAL AND PROCEDURAL HISTORY

Based upon the evidence presented at trial, it is reasonable to infer that the jury considered the following relevant and pertinent facts when rendering its verdict:

Sometime prior to a medical visit to defendant, plaintiff, a 41-year-old African American male, had worked on a cancer awareness program designed to encourage African American males to be screened for prostate cancer.[1] On January 7, 1999, plaintiff went to Penn Center for Primary Care for a complete routine physical examination, and for treatment and evaluation of an asthma

---

1. N.T. 1/24/05 at 63:11-25.

condition.[2] Plaintiff was examined by defendant who performed, inter alia, a digital rectal exam and found no masses on plaintiff's prostate.[3] Defendant ordered laboratory blood studies which returned positive for elevated cholesterol.[4] The blood studies ordered did not include a prostate-specific antigen (PSA) screening test.[5]

Plaintiff returned to Penn Center for Primary Care approximately 20 months later for another physical examination. He was examined by defendant.[6] At that time, she did not conduct a digital rectal exam nor order a PSA blood screening test.[7]

On November 7, 2001, plaintiff returned to Penn Center for Primary Care and this time was seen by Aba Barden Maja M.D., for complaints of fever, chills, and respiratory problems.[8] He underwent a physical examination and a digital rectal exam, which was found to be abnormal. Dr. Barden ordered a PSA test.[9] On November 13, 2001, Dr. Barden called plaintiff and informed him that his PSA was greatly elevated and that he needed to undergo a biopsy and further tests.[10] Subsequently, plaintiff was diagnosed with prostate cancer.[11]

Plaintiff was seen by numerous physicians following the diagnosis of prostate cancer, some who recommended

---

2. *Id.* at 59:15-65:15.
3. N.T. 1/25/05 19:22-24.
4. *Id.* at 25:16-19 and 27:6-8.
5. *Id.* at 25:22-24.
6. *Id.* at 34:22-24.
7. *Id.* at 34:25-35:2 and 35:11-15.
8. N.T. 1/24/05 at 162:2-164:11.
9. *Id.* at 165:23-166:24.
10. *Id.* at 170:17-171:2.
11. *Id.* at 171:11-12.

conventional modes of treatments, including regular hormone therapy, chemotherapy and castration.[12] Plaintiff rejected the majority of these recommendations and was advised by a physician that he might be able to live up to 10 years with castration but, without this surgery, his life expectancy was about six months.[13] Plaintiff did not accept this treatment option,[14] but instead, underwent hormone therapy which he later discontinued due to adverse side effects. He sought alternative treatment, including injections of a derivative of mistletoe, changed his diet, and took vitamins.[15]

Procedurally, a jury trial was originally scheduled for August 9, 2004. However, due to plaintiff's expert's sudden unwillingness to testify, it was continued to allow plaintiff an opportunity to obtain a new expert. On January 24, 2005, a jury trial commenced. On January 28, 2005,[16] the jury found in favor of plaintiff and against defendant in the amount of $2,859,770, and further found that plaintiff was 10 percent comparatively negligent and defendant was 90 percent comparatively negligent. The verdict amount was subsequently reduced by 10 percent, or $285,977, for an adjusted verdict award of $2,573,793.

On February 4, 2005, defendant filed a timely post-trial motion requesting judgment n.o.v. and/or a new trial. On February 7, 2005, plaintiff filed a motion for delay

12. *Id.* at 77:12-13 and 79:9-16.

13. N.T. 1/24/05 at 120:4-5.

14. *Id.* at 120:4-5.

15. *Id.* at 82:8-17.

16. According to the docket entry dated February 7, 2005, the jury returned a verdict on January 18, 2005. This incorrect date appears to be a typographical error.

damages. Oral argument was scheduled for these motions, and on April 14, 2005, this trial judge denied defendant's post-trial motion, and granted plaintiff's petition for delay damages in the amount of $184,026.71. The adjusted verdict amount was molded to reflect the award for delay damages to a total verdict award of $2,757,826.91.

As stated, dissatisfied with this trial judge's ruling, defendant filed the instant appeal.

## ISSUES

Defendant's timely statement of matters complained of on appeal filed pursuant to Pennsylvania Rule of Appellate Procedure 1925(b) avers:

"(1) The honorable trial court erred in twice overruling defendant's objection to testimony from plaintiff's fact witness, Richard Ruffin, that plaintiff is 'an honest' man, and in refusing on both occasions to strike the inappropriate character evidence and to instruct the jury that it should not consider the evidence, so as to warrant the granting of a new trial;

"(2) the honorable trial court erred in failing to discharge juror no. 10 when he disclosed he was a friend of plaintiff's fact witness, Richard Ruffin, and that he could not be sure if he would be influenced in his decision-making because of that friendship, so as to warrant the granting of a new trial;

"(3) the honorable trial court erred in permitting plaintiff's expert, Thomas Kasper M.D., to testify over defendant's objections as to opinions not expressed in his written report, including the opinion that the grade

of plaintiff's prostate cancer would not have been the same in 1999 as it was when diagnosed in 2001, and that therapy could not guarantee plaintiff an increased life expectancy, so as to warrant the granting of a new trial; and

"(4) the honorable trial court erred in permitting plaintiff's expert, Thomas Kasper M.D., to testify over defendant's objections as to opinions not stated to the degree of medical certainty required to be admissible, including the opinion that the grade of plaintiff's prostate cancer would not have been the same in 1999 as it was when diagnosed in 2001, and that in 1999 the cancer was most probably localized to the prostate gland and had not spread to the regional lymph nodes or distantly to the bone as it had in December of 2001, so as to warrant the granting of a new trial."

## LAW AND DISCUSSION

As noted, defendant claims that this trial judge committed four errors which would entitle her to either judgment n.o.v. and/or a new trial. This trial judge disagrees.

From the outset, it is important to mention that this case revolved on a determination of credibility of the highly contested issue of whether plaintiff requested to be screened for prostate cancer during the January 7, 1999 physical examination performed by defendant. In this regard, plaintiff adamantly testified that he had a clear recollection that he had discussed with his wife the need to have a physical examination and a prostate cancer screening, and that at the time of his visit with defendant, he specifically requested a PSA screening.[17] On the

17. N.T. 1/24/05 at 64:19-22.

other hand, defendant testified that she had a vague recollection of the physical examination performed, but that she was certain that plaintiff had not requested a PSA test,[18] because had plaintiff requested a prostate cancer screening, she would have had a conversation with him about the risks and benefits of the test and would have noted the fact of this conversation in his medical record, and nothing of the sort is contained in the chart.[19] Defendant also testified that, as a habit, she conducts digital rectal examinations during routine physical examinations, but does not order PSAs on asymptomatic 41-year-old patients, without a specific request to do so.[20] (Another point of contention, whether African American males ages 40 and older should have routine PSA screening, was discussed by the experts for the parties.) However, defendant admitted that she deviated from her usual practice when she did not perform a digital rectal examination during plaintiff's second physical examination 20 months after the first visit.[21] This case boiled down to a determination on what plaintiff did or did not request. Defendant's testimony on this critical factual issue, considering all the evidence of record, was perceived by the jury as being not as credible as plaintiff's narration of the events. Clearly, it is the jury's prerogative to assess credibility, and the evidence of record supports their assessment.

As to this trial judge's ruling on defendant's post-trial motion, it is undisputed that the decision to grant and/or

18. N.T. 1/25/05 at 21:21-22:9.

19. *Id.* at 21:21-22:9.

20. *Id.* at 38:12-19:16 and 40:20-41:15.

21. N.T. 1/25/05 at 35:11-18.

deny a request for a new trial is within the sound discretion of the trial court. *Andrews v. Jackson,* 800 A.2d 959, 962 (Pa. Super. 2002), *appeal denied,* 572 Pa. 694, 813 A.2d 835 (2002). An appellate court may not disturb a trial court's ruling unless the trial court palpably abused its discretion or committed an error of law. *Neison v. Hines,* 539 Pa. 516, 520, 653 A.2d 634, 636 (1995); *Andrews,* 800 A.2d at 962. An abuse of discretion is not merely an error of judgment. An abuse of discretion occurs if, in reaching a conclusion, the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence of record. See *Fanning v. Davne,* 795 A.2d 388, 393 (Pa. Super. 2002), citing *Paden v. Baker Concrete Construction Co. Inc.,* 540 Pa. 409, 412, 658 A.2d 341, 343 (1995); *Price v. Chevrolet Motor Div. of General Motors Corp.,* 765 A.2d 800, 806 (Pa. Super. 2000). However, an abuse of discretion may not be found merely because the appellate court might have reached a different conclusion. The court's action requires a showing of manifest unreasonableness, or partiality, prejudice, bias, or ill will, or such lack of support as to be clearly erroneous. *Fanning,* 795 A.2d at 393.

A new trial is warranted where the jury's verdict is so contrary to the evidence as to shock one's sense of justice. *Neison,* 539 Pa. at 520, 653 A.2d at 636. However, a new trial should not be granted because of a mere conflict in testimony or some irregularity which occurred during trial or because another trial judge, on the same facts, would have arrived at a different conclusion. *Harman ex rel. Harman v. Borah,* 562 Pa. 455, 467, 756

A.2d 1116, 1122 (2000). "The moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." *Id.* at 467, 756 A.2d at 1122. (citations omitted) A trial court's decision to grant or deny a new trial is subject to consideration of all of the evidence, viewed in the light most favorable to the verdict winner. *Haddad v. Gopal,* 787 A.2d 975, 979 (Pa. Super. 2001), *appeal denied,* 572 Pa. 694, 813 A.2d 842 (2002).

On the other hand, "when reviewing a motion for judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the verdict winner, who must be given the benefit of every reasonable inference of fact." *Fanning,* 795 A.2d at 392. "Any conflict in the evidence must be resolved in the verdict winner's favor." *Id.* (citation omitted)

There are two bases upon which a judgment n.o.v. can be entered: (1) the movant is entitled to judgment as a matter of law and/or (2) the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in his favor, whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure. *Lanning v. West,* 803 A.2d 753, 756 (Pa. Super. 2002).

## Character Evidence

In the first appellate issue, defendant contends that this trial judge twice erred in overruling the objections to the testimony from plaintiff's fact witness, Mr. Richard

256

Ruffin; to wit: that plaintiff is "an honest" man; and in refusing on both occasions to strike the inappropriate character evidence and instruct the jury that it should not consider the evidence, so as to warrant the granting of a new trial.

The admission or exclusion of evidence is within the sound discretion of the trial court, and in reviewing a challenge to the admissibility of evidence, the appellate court will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law. A trial court has wide discretion in ruling on the relevancy of evidence and its rulings will not be reversed absent an abuse of discretion. *Fidler v. Cunningham-Small,* 871 A.2d 231 (Pa. Super. 2005). A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently. The moving party must demonstrate prejudice resulting from the mistake before a new trial can be granted. *Id.*

Here, defendant does not point to the specific objectionable passage in the trial transcript that pertains to this allegation of error. The reason may be because this error does not exist. A careful review of the trial transcript does not find the specific word *honest* mentioned nor used by Mr. Ruffin. However, the closest finding to the word "honest" in the official transcript of the testimony can be found where Mr. Ruffin stated with regard to plaintiff:[22]

"I mean, he's still, you know, a—I forget the word, *honorable,* or he still keeps a certain decorum about him-

---

22. N.T. 1/25/05 at 84:5-16.

self. I mean, he's not the kind of guy that's going to start crying about his situation. He's very proud that way, if I could use that word. But now, over the last, especially like the last six or nine months, I mean, he's just—he's losing himself into the illness." (emphasis added)

Thereafter, defendant objected and moved to strike this testimony. This trial judge overruled the objection based upon Pennsylvania Rule of Evidence 608, Evidence of Character and Conduct of Witness, which provides, in its pertinent part:

"(a) Reputation evidence of character. The credibility of a witness may be attacked or supported by evidence in the form of reputation as to character, but subject to the following limitations:

"(1) the evidence may refer only to character for truthfulness or untruthfulness; and

"(2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by reputation evidence or otherwise." Pa.R.E. 608.

Under Rule 608, any mention of plaintiff being an honest man would be inadmissible in the absence of a prior attack of the plaintiff's truthfulness. In this trial judge's opinion, the alleged character evidence of truthfulness or plaintiff being "an honest" man was not actually offered. Therefore, defendant's argument is without merit.

Notwithstanding and assuming arguendo that defendant is referring in her argument to the term "honorable," this term conceivably could be interpreted as referring to truthfulness. However, this term can also be inter-

preted, as in the context used by Mr. Ruffin, as referring to "dignity and composure." [23] The context of Mr. Ruffin's testimony explained his use of the word "honorable," when stating that the plaintiff "still keeps a certain decorum about himself" and that "he's not the kind of guy that's going to start crying about his situation." In this trial judge's opinion, considering the surrounding testimony, Mr. Ruffin's opinion of plaintiff was properly admitted. This testimony did not go to plaintiff's reputation or character for truthfulness, but instead, to the kind of "stiff-upper-lip kind of person" Mr. Ruffin believes plaintiff to be.

In this trial judge's opinion, the admission of the testimony does not warrant the granting of a new trial and/or judgment n.o.v. Should the appellate court, however, find that this testimony was improperly admitted, this trial judge opines that the use of the term "honorable" is, at most, a harmless error which also does not warrant either the granting of a judgment n.o.v. and/or a new trial.

### Juror Discharge

Defendant contends that this trial judge erred in failing to discharge juror no. 10 when said juror disclosed that he knew plaintiff's fact witness, Richard Ruffin, and that he could not be sure if he would be influenced in his

---

23. The Mirriam-Webster Dictionary definition of "honorable" in its *synonyms* includes the word "noble," and in its *related words* includes "proper," "seemly," and "chivalrous." In the context used, Mr. Ruffin used the word "honorable," as referring to proper or the dignity and composure of Mr. Hines, and not necessarily referring to his character for truthfulness.

decision-making because of that relationship. Defendant is somewhat disingenuous in this contention.

A careful review of the trial transcript reveals what actually occurred during the preliminary questioning of Mr. Ruffin:

"Mr. Ruffin: '[E]xcuse me just for a moment, but I think I recognize a juror.'

"Mr. Stein: Side-bar, your honor?

"The court: Is there a relationship between you and the juror that you recognize?

"Mr. Ruffin: Just that he used to work with my wife a while ago. That's all. We don't have a personal relationship, but I just recognized him and I thought I should bring that to your attention.

"The court: When was the last time you socialized with him?

"Mr. Ruffin: Probably 10 years ago, besides seeing him on the street and saying hi.

"The court: Let's have a side-bar."

(Thereupon, a side-bar discussion was held out of the presence of the jury as follows:)

"Mr. Fitzpatrick: During voir dire, this man was not identified, the juror, as I recall, and the juror would have had the opportunity to tell us that he recognizes him. There are other jurors—one juror was released because he thought, even though he was mistaken, he might have known Dr. Kosseim. I think it's improper. How can we have this witness? We have no idea how this would affect anything.

"Mr. Stein: If I may respond, your honor, I didn't conduct voir dire, but I do believe Mr. Ruffin was identified, and the only way to do that would be to ask his recollection. But when Mr. Troiani and I stood up, he did the list of witnesses and he's on our witness list as well.

"The court: Do you recall the name? [Directing the question to the court crier.]

"The court crier: I don't remember his name, and I also know him from across the street from being in the courtroom.

"The court: That would have no bearing on the deliberation. I think the proper thing to do is to call the juror and conduct a voir dire with him.

"Mr. Fitzpatrick: Fine, your honor. Do you want to instruct them?

"The court: I think we should do that now before the testimony continues."

(Thereupon, the side-bar discussion was concluded, and the proceedings were continued as follows to the jury:)

"The court: Just so you don't start thinking about what we're doing, I do need to ask some questions now that we have found out that they have known each other, to make sure that he can continue to be an impartial juror in this matter. I have to do this at side-bar."

(Thereupon, a side-bar discussion was held out of the presence of the jury as follows:)

"The court: Mr. Wilson?

"Juror number 10: Yes.

"The court: You indicate that you do know this person?

"Juror number 10: Yes, I do.

"The court: What type of relationship is that?

"Juror number 10: His wife and I worked together for about a year or so at the library. We worked together for about a year in 1990.

"The court: Do you socialize with him?

"Juror number 10: No.

"The court: When was the last time you socialized with him?

"Juror number 10: My retirement dinner—not my retirement. My going away dinner there, which was about 1996.

"The court: The fact that he is going to be testifying to certain things, his relationship with the plaintiff, would that in any way make you impartial to hear this case and decide it based—

"Juror number 10: It's hard to judge until I hear what he's going to have to say.

"The court: If he says the plaintiff is my best friend and he's suffering a lot?

"Juror number 10: I think I understand that he has done that. I understood that from Mr. Hines. I don't think it's going to make any difference from what I've heard from Mr. Hines than what I'm going to hear from Mr. Ruffin.

"The court: The fact that you know Mr. Ruffin, would that make his testimony more credible to you that [sic] judging him as you would judge anybody else?

"Juror number 10: I don't remember him as close of a friend as other people.

"The court: But would you be able to judge his testimony as to credibility equally as you would judge the other witnesses that have been testifying?

"Juror number 10: Yes.

"The court: Is there any hesitation?

"Juror number 10: As I said, I don't know what he's going to say, so I'm not sure.

"The court: If there is anything that you feel at the end of having heard him that would make you bias towards one side or the other, please let me know, but I don't want to know what you're thinking. I just want to know your reaction, because it's fair that you don't know what he's going to say that is going to taint your way of thinking. But if you feel at the end of his testimony you're going to be able to continue to weigh all the evidence fairly and impartially for either side, if you feel you can do that, don't say anything to me. But if you feel your judgment has been affected because of some relationship you had in the distant past with him, please let me know.

"Juror number 10: Okay.

"The court: Thank you, Mr. Wilson. Are you satisfied, counsel?

"Mr. Fitzpatrick: With that caveat.

"Mr. Stein: I'm satisfied.

"The court crier: We don't remember the names. He never raised his hand to say that he knew him, or doing the individual voir dire, he didn't say anything, so we wouldn't recollect that.

"Mr. Fitzpatrick: Do you want to take a break for a few minutes?

"The court: No.

"Mr. Stein: I have an objection. I'm not going to be very long. He is a before-and-after witness.

"Mr. Fitzpatrick: Give me a second, please, your honor."

(Thereupon, defense counsel, Mr. Fitzpatrick, conferred with his client.)

"Mr. Fitzpatrick: No objection, your honor, with the caveat that if something pops up, he should let us know.

"The court: Okay."

(Thereupon, the side-bar discussion was concluded, and the proceedings were continued.)

Generally, a party waives an issue concerning a perceived trial court error if the party fails both to preserve the issue with a timely and specific objection at trial and to present it in post-trial motions. *Harman,* 562 Pa. at 471, 756 A.2d at 1124. This case also provides a limited exception to the waiver doctrine, *i.e.,* where it appears from all the circumstances that a timely objection to perceived judicial misconduct would be meaningless, a party may choose to raise the issue for the first time at post-trial motions to preserve it for appellate review. This involves some risk, which a trial counsel should not assume lightly. The burden is on the party asserting the *Harman* exception to the waiver doctrine to demonstrate that lodging a timely objection would have been meaningless.

Here, this waiver doctrine does not apply. The record is clear that defendant's counsel had an opportunity to

confer with defendant and specifically responded to this trial judge's inquiry, "No objection, your honor, with the caveat that if something pops up, he should let us know." [24] Nothing appeared to have "popped up" since the juror did not indicate to the trial judge any concerns. Further, as implied by the juror, Mr. Ruffin's testimony did not bolster plaintiff's testimony. His relationship to Mr. Ruffin was, at most, distant and tenuous. Accordingly, defendant has waived the issue.

### Expert Testimony Outside the Scope of the Report

Next, defendant contends that this trial judge erred in permitting plaintiff's expert, Thomas Kasper M.D., a board-certified urologist, to testify as to opinions not expressed in his written report, including the opinion that the grade of plaintiff's prostate cancer would not have been the same in 1999 as it was when diagnosed in 2001, and that therapy could not guarantee plaintiff an increased life expectancy.

Generally, all relevant evidence is admissible, except as otherwise provided by law. Pa.R.E. 402. A witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise. Pa.R.E. 702. The facts or data in a particular case upon which an expert bases an opinion may be those perceived by or made known to the expert at or before the hearing. Pa.R.E. 702.

In determining whether to admit expert testimony into evidence, a trial judge has wide discretion and will not

---

24. N.T. 1/25/05 at 75:17-19.

be reversed unless there has been a clear abuse of this discretion. *Greer v. Bryant,* 423 Pa. Super. 608, 621 A.2d 999 (1993); *Burton-Lister v. Siegel, Sivitz and Lebed Associates,* 798 A.2d 231, 240 (Pa. Super. 2002), *appeal denied,* 570 Pa. 680, 808 A.2d 568 (2002). Expert witnesses can expand on and amplify upon their pretrial reports, as long as they do not proffer a new theory or present trial testimony inconsistent with the fair scope of their reports. *Chanthavong v. Tran,* 452 Pa. Super. 378, 682 A.2d 334 (1996). In addition, Pennsylvania Rule of Civil Procedure 4003.5(c), in its *fair scope rule* provision provides:

"To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings . . . the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the . . . separate report, or supplement thereto. However, the expert shall not be prevented from testifying as to facts or opinions on matters which the expert has not been interrogated in the discovery proceedings." Pa.R.C.P. 4003.5(c).

In other words, an expert witness may not testify on direct examination to matters that are either inconsistent with or go beyond the fair scope of matters provided in discovery proceedings or in a separate report. *Woodard v. Chatterjee,* 827 A.2d 433, 441 (Pa. Super. 2003). The *fair scope* or within *the four corner* rule favors the liberal discovery of expert witnesses and disfavors unfair and prejudicial surprises. The purpose of the discovery rules is to "prevent surprise and unfairness and to allow a fair trial on the merits." *Dominick v. Hanson,* 753 A.2d

824, 826 (Pa. Super. 2000), quoting *Linker v. Churnetski Transportation Inc.,* 360 Pa. Super. 366, 368, 520 A.2d 502, 503 (1987), *appeal denied,* 516 Pa. 641, 533 A.2d 713 (1987). Additionally, the appellate court stated in *Kaminski v. Employers Mutual Casualty Company,* 338 Pa. Super. 400, 408, 487 A.2d 1340, 1344-45 (1985), quoting *Sindler v. Goldman,* 309 Pa. Super. 7, 12, 454 A.2d 1054, 1056 (1982):

"The purpose of the discovery rules is to prevent surprise and unfairness and to allow a trial on the merits. When expert testimony is involved, it is even more crucial that surprise be prevented, since the attorneys will not have the requisite knowledge of the subject on which to effectively rebut unexpected testimony. By allowing for early identity of expert witnesses and their conclusions, the opposing side can prepare to respond appropriately instead of trying to match years of expertise on the spot. Thus, the rule serves as more than a procedural technicality; it provides a shield to prevent the unfair advantage of having a surprise witness testify."

The explanatory comments to Pa.R.C.P. 4003.5 advise parties to make broad discovery inquiries in order to force all of the expert's proposed testimony into the report and prevent surprise at trial. Further, it is for the trial court to determine whether the expert's report gives sufficient notice of the expert's theory to the opposing party to prepare its rebuttal witness(es). *Tiburzio-Kelly v. Montgomery,* 452 Pa. Super. 158, 173, 681 A.2d 757, 765 (1996). Thus, the litmus test is whether the trial testimony is within the *fair scope* or *the four corners* of the expert's report and whether plaintiffs were prejudiced and/or surprised by the actual testimony. *Jones v.*

*Constantino,* 429 Pa. Super. 73, 631 A.2d 1289 (1993), *appeal denied,* 538 Pa. 671, 649 A.2d 673 (1994).

To determine whether an expert's testimony is within the *fair scope* of his pretrial report, the court must decide: whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pretrial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response. *Burton-Lister,* 798 A.2d at 241.

There are no definite rules for determining whether testimony exceeds the *fair scope* of a report; said determination must be reviewed on a case-by-case basis. *Wilkes-Barre Iron & Wire Works Inc. v. Pargas of Wilkes-Barre Inc.,* 348 Pa. Super. 285, 502 A.2d 210 (1985). In deciding whether testimony is within the scope of the report, the emphasis is on the word *fair* as " 'fair' scope contemplates a reasonable explanation and even an enlargement of the expert's written words." *Millard v. Nagle,* 402 Pa. Super. 376, 404, 587 A.2d 10, 23 (1991), quoting *Wilkes-Barre, supra.*

Where an expert report was written in absolute language, adverse counsel should anticipate that the expert's trial testimony would expand on his report. *Greer v. Bryant,* 423 Pa. Super. 608, 615, 621 A.2d 999, 1004 (1993). The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pretrial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response. *Chanthavong, supra.*

Here, Dr. Kasper, in his videotaped trial testimony taken five days before the commencement of trial, essentially opined that the grade of plaintiff's prostate cancer would not have been the same in 1999 as it was when diagnosed in 2001, and that therapy could not guarantee plaintiff an increased life expectancy. In his written report, Dr. Kasper expressed the following:[25]

"Page 2: 'The pathology report [from the December 17, 2001 guided needle biopsy] revealed a Gleason grade 9 (Gleason scale being grade 2-10—grade 2 being the least aggressive and grade 10 being the most aggressive)'
. . .

"Page 3: 'It is my opinion as a board-certified urologist that had Dr. Kosseim performed a screening PSA serum test on January 7, 1999, Mr. Hines' PSA would have been in the abnormal range and prompted referral for urologic evaluation. This referral for urologic evaluation would have resulted in likely finding prostate cancer *localized* to the prostate glands at which time definitive treatment could have been recommended.' "

In this trial judge's opinion, Dr. Kasper's trial testimony falls within the *fair* scope of his written report, and is consistent with the report. There is no prohibition that an expert cannot expand and/or explain the opinions submitted in a written report.

Regarding the opinion that therapy could not guarantee plaintiff an increased life expectancy, Dr. Kasper's written report contains the following:

---

25. Dr. Kasper's report dated December 15, 2003.

"Page 1: 'Dr. Kosseim's failure to heed the guidelines and adhere to the accepted standard of good medical practice denied Mr. Hines the opportunity to have his prostate cancer diagnosed in a *timely* fashion such that *definitive curative treatment* could be instituted.' (emphasis added) . . .

"Page 3: 'The most important tenant [sic] as it applies to the case of Gilbert Hines is that the *earlier* one makes the diagnosis of prostate cancer, the greater the chance of curing the disease or controlling the disease if it has already spread outside the local confines of the prostate gland. The *delay* of almost three years from Mr. Hines' 1999 physical examination by Dr. Kosseim to the diagnosis in November of 2001 by Drs. Barden and Axelrod allowed Mr. Hines' localized prostate cancer to increase in size, spread locally and metastasize distally, thereby *denying him the opportunity for definitive curative treatment and reducing his chances of long-term survival.*' (emphasis added)"

In this trial judge's opinion, Dr. Kasper's report addresses his concerns that the lack of a timely diagnosis allowed the cancer to spread and denied plaintiff an opportunity for a cure and long-term survival. Although his trial testimony was not in the exact words, his opinions, both written and oral were similar and consistent. Clearly, Dr. Kasper opined that plaintiff has no guarantee of anything definitive in his future, regardless of any therapeutic intervention.

Based upon this careful dissection of the written report and the trial testimony, this trial judge opines that defendant's argument that Dr. Kasper's trial testimony exceeded the fair scope of his written report is without

merit. There was no unfair surprise in the expert's testimony. Furthermore, defendant was allowed an opportunity to make a meaningful response and was not misled as to the nature of the appropriate response needed for her defense. Defendant cannot argue "unfair surprise" or "lack of sufficient notice" to prepare a rebuttal to these opinions since the written report was provided in accordance with the deadlines established and the trial deposition took place on January 19, 2005, five days in advance of the trial date. This advance time period gave defendant ample opportunity to have her own expert(s) thoroughly review Dr. Kasper's trial opinions and address and/or rebut any opinions expressed by Dr. Kasper during his trial deposition, an opportunity not lost to defendant expert, Leonard Gomella M.D., also a board-certified urologist. For example:[26]

"Mr. Fitzpatrick: Dr. Kasper, in his report and in his testimony, told the jury that if a PSA test had been offered to Mr. Hines on January 7th of 2000—I'm sorry, of 1999, that the PSA test would have been elevated and that it's his belief and his opinion that that cancer would have been limited to the prostate itself and not have spread at that point in time. Is that how you understood his report to be?

"Dr. Gomella: Yes.

"Mr. Troiani: Objection, your honor.

"The court: Overruled.

"Mr. Troiani: And I know where this is going. Can I have a side-bar, your honor?

---

26. N.T. 1/26/05 at 74:12-25.

"The court: I know where it's going, too. Overruled."

Further along in his testimony, Dr. Gomella opined:[27]

"Mr. Fitzpatrick: Doctor, to a reasonable degree of medical certainty, do you have an opinion as to whether or not Mr. Hines' prognosis for this cancer that he has have changed at all had the cancer been found in January of 1999?

"Mr. Troiani: Objection, your honor.

"The court: Overruled.

"Dr. Gomella: Based on our best understanding of Gleason 9 cancers and about two plus years, two and-a-half years after that first encounter with Dr. Kosseim, knowing the growth of cancers as best as we understand it, Gleason 9 cancers—and we have to understand something. Cancer in the prostate doesn't just come up within a few weeks or a few months. There is a slow lead time for these cancers coming up. But the problem is, if you have a Gleason 9, the propensity for them to either jump outside the prostate and cause a nodule or anything— I'll give you an example here. If there was no nodule in his prostate and he got a rectal exam, two years later, his prostate was packed with Gleason 9 cancer. It tells you that this cancer has got its own mind. It's acting its own way. So, probably, what's happening is it was getting out of the prostate. And, unfortunately, that's what Gleason 9 cancers do. You have to understand that. They tend to escape from the prostate before they cause multiple symptoms, and that's the challenge that we have here with these high-grade cancers.

---

27. N.T. 1/26/05 at 81:5-82:25.

"Mr. Troiani: Objection, your honor, move to strike.

"The court: Overruled."

As the above testimony illustrates, Dr. Gomella was given much latitude to address fully the progression of prostate cancer and the timing of the diagnosis, expand on his opinions, and rebut whatever opinion had been previously expressed by Dr. Kasper.

### Expert Testimony Not Stated to Required Degree of Medical Certainty

Lastly, defendant contends that this trial judge erred in allowing Dr. Kasper to testify, despite defendant's objections, to opinions not stated to the required degree of medical certainty, including his opinions that the grade of plaintiff's prostate cancer would not have been the same in 1999 as it was when diagnosed in 2001; and that in 1999, the cancer was most probably localized to the prostate gland and had not spread to the regional lymph nodes or distantly to the bone as it had in December of 2001.

Specifically, defendant objected to the following exchange:

"Q. Is it your opinion that [plaintiff's] cause of cancer was localized in January 1999 or had it spread or can you tell?

"A. It is my opinion within a recently agree [sic] of medical certainty that his cancer was *most probably* localized to the gland and had not spread to regional lymph nodes or distantly to bones as it had in December of 2001.

"Q. And how do you know that, doctor? What is the basis of your opinion?

"A. The basis of my opinion was—is the literature in some of medianalyses of high grade Gleason tumors show that prostate cancers based on these aggressive doubling times are *more likely than not* with PSAs in the range of one to 20, high teens, are in a significant percentage of cases localized the prostate gland." [28]

In addition to the above testimony, which was to the requisite degree of medical certainty (incorrectly transcribed above as "recently agree of medical certainty"), he repeated his opinion:

"Q. [D]id he have an elevated or normal PSA [on January 7, 1999]?

"A. My opinion, he would have had an elevated or abnormal PSA based on what he presented with in November of 2001 when his PSA was elevated above 800.

"Q. How can you tell, doctor, that back two-and-a-half years before January 1999 that he had an elevated PSA?

"A. Well, we can tell with a *reasonable degree of medical certainty* using a factor of doubling times. What we do know is that in December of 2001 Mr. Hines was diagnosed with a fairly aggressive behaving form of prostate cancer, a Gleason 9 prostate cancer that involved at least 80 percent of most areas of his prostate that were biopsied. It also had spread at that time to boney structures and to lymph nodes in his abdomen. Using doubling times and going backwards by having the PSA value every six months which is a fairly aggressive behaving

---

28. Trial deposition Kasper, 1/19/05 at 32:18-33:11. (emphasis added)

tumor, which is what Mr. Hines had, you can calculate backwards and get a value of or a range of values of what his PSA would be in January of 1999."[29]

Dr. Kasper was asked a similar question without objection:

"Q. Now, at the time that Dr. Kosseim did the digital rectal exam in January 1999, did Mr. Hines have cancer that spread outside of the prostate?

"A. In my opinion, he did not.

"Q. And what is the basis of your opinion?

"A. My opinion is based on the calculated PSA and the fact that Dr. Kosseim did not feel any abnormality in his prostate on digital rectal exam.

"Q. What significance is that?

"A. [T]he significance of that is that there was not in my opinion a significant amount of tumor burden within the prostate so that you could not feel any abnormality of the prostate in January of 1999."[30]

Of utmost importance, however, is the fact that, at the beginning of Dr. Kasper's testimony, the following exchange occurred:

"Q. Those opinions, doctor, that *you are going to give,* are they to a *reasonable degree of medical certainty?*

"A. They are."[31]

Clearly, Dr. Kasper expressed his opinions within the required standard. Nevertheless, an expert need not testify with absolute certainty or rule out all possible causes

---

29. Trial deposition Kasper, 1/19/05 at 21:3-22:4. (emphasis added)
30. *Id.* at 36:21-37:13.
31. *Id.* at 19:12-15. (emphasis added)

of a condition, nor must an expert testify in precisely the language used to enunciate the legal standard. *Eaddy v. Hamaty,* 694 A.2d 639, 642 (Pa. Super. 1997). When a party must prove causation through expert testimony, the expert must testify with "reasonable certainty" that in his professional opinion, the result in question did come from the cause alleged. See *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978). An expert's testimony is reviewed in its entirety to assess whether it expresses the requisite degree of medical certainty. *Id.* Further:

"An expert fails this standard of certainty if he testifies 'that the alleged cause "possibly," or "could have" led to the result, that it "could very properly account" for the result, or even that it was "very highly probable" that it caused the result.' *Kravinsky v. Glover,* 263 Pa. Super. 8, 21, 396 A.2d 1349, 1356 (1979). (citations omitted)" *Eaddy,* 694 A.2d at 642.

Read in its entirety, Dr. Kasper's opinion testimony met the requisite degree of medical certainty. Thus, no error was committed in allowing his opinions into evidence.

## CONCLUSION

Based on the foregoing analysis and case law, this trial judge is of the opinion that no error was committed in denying plaintiff's post-trial motion. This trial judge respectfully requests that plaintiff's appeal be dismissed, and that the jury's molded verdict and the order dated April 14, 2005, be affirmed.